101 B.R. 866 (1989)
In re GILLETTE ASSOCIATES, LTD., Charles Ervin Stein, Debtors.
Bankruptcy Nos. B87-00769-Y, B87-00770-Y.
United States Bankruptcy Court, N.D. Ohio.
June 7, 1989.
*867 Michael A. Gallo, Youngstown, Ohio, for debtors.
Frederick S. Coombs, III, Youngstown, Ohio, for Official Bondholders Committee.
Joseph C. Winner, Columbus, Ohio, for Bancohio Nat. Bank, Indenture Trustee.

MEMORANDUM OPINION
WILLIAM T. BODOH, Bankruptcy Judge.

INTRODUCTION
Two issues are before the Court for resolution. The first involves the Proof of Claim filed by BANCOHIO and the second is the confirmation of a plan of reorganization of the Debtors.
GILLETTE ASSOCIATES, LTD., ("GILLETTE") and CHARLES ERVIN STEIN ("STEIN") (collectively "Debtors") filed petitions for reorganization under Chapter 11 of Title 11 in 1987. When Debtors failed to file a plan within the exclusivity period, BANCOHIO NATIONAL BANK ("BANCOHIO") filed a plan providing for liquidation of Debtors. Debtors later filed a plan of reorganization. The Debtors' Plan consists of the following writings:
1. First Amended Plan of Reorganization filed December 16, 1988.
2. Modification of Plan filed February 22, 1989.
3. Modification of Plan filed March 31, 1989.
BANCOHIO's Plan is comprised of two (2) documents:
1. Second Amended Plan filed November 23, 1988.
2. Post-Balloting Modification of Second Amended Plan, filed February 23, 1989.
A joint confirmation hearing was held by the Court on February 24, 1989. Posthearing memoranda have been submitted by both Plan proponents and THE OFFICIAL BOND HOLDERS COMMITTEE.
This is a core proceeding pursuant to 28 U.S.C. Sec. 157(b)(2)(A), (B), (K), and (L).

BACKGROUND
In October 1984, Trumbull County, Ohio, issued industrial revenue bonds to finance the acquisition of land and construction of a 100-bed intermediate nursing care nursing home facility located at 3310 Elm Road, NE, Warren, Ohio 44484 ("GILLETTE ASSOCIATES NURSING HOME PROJECT", or "PROJECT"). TONN & BLANK, INC., was the prime contractor for the project. BANCOHIO is the indenture trustee for the holders of Two Million, Six Hundred Ten Thousand & 00/100 Dollars ($2,610,000.00) of the Trumbull County, Ohio industrial development first mortgage revenue bonds, 13¾ percent, Series 1984 ("Bonds").
GILLETTE is an Ohio limited partnership. STEIN is the sole general partner of GILLETTE. KENNETH R. EVERSOLE ("EVERSOLE") was the sole limited partner *868 of GILLETTE, but his interests were purchased pre-Petition by STEIN.
A loan agreement was executed between Trumbull County and GILLETTE. GILLETTE also executed a promissory note, which was secured by an open-end mortgage and security agreement. A Trust Indenture was executed between Trumbull County and BANCOHIO pursuant to which, inter alia, Trumbull County assigned the loan agreement, note and openend mortgage and security agreement to BANCOHIO for the benefit of the bond holders. The bond issue closed on October 31, 1984, and construction commenced.
Under the terms of the note and loan agreement, GILLETTE was obliged to make monthly payments to BANCOHIO for the benefit of the bond holders. Between October 1984 and October 1987, GILLETTE was only obliged to pay the interest accruing on outstanding bonds and was entitled to a credit for earnings on the bond monies held by BANCOHIO pursuant to the loan agreement and Trust Indenture. The Trust Indenture required BANCOHIO to deposit, from proceeds of bond sales, the sum of Two Hundred Ninety-Five Thousand & 00/100 Dollar ($295,000.00) into a Debt Service Reserve Fund. Funds in the Debt Service Reserve Fund were restricted to use "to prevent any default in the payment of principal, of interest, and premium, if any, on the bonds, if monies in the Bond Fund are insufficient to pay the same as they become due." Trust Indenture, Sec. 4.04(b), p. 17-18. GILLETTE met its first interest payment, due on November 25, 1985, but failed to meet additional payments. BANCOHIO made withdrawals from the Debt Service Reserve Fund to pay interest due to bond holders on April 1, 1986 and October 1, 1986.[1] The Trust Indenture provided for the replenishment of the Debt Service Reserve Fund in the following manner:
Pursuant to the Loan Agreement [Sec. 2.1(c)(1), p. 13] in the event that monies in the Debt Service Reserve Fund are used for any purpose authorized by this Indenture (other than payment at maturity), Debt Service Reserve deposits shall be made by depositing into the Debt Service Reserve Fund on the twenty-fifth day of each of the next succeeding twelve months after such withdrawal one-twelfth (1/12) of the amount of such withdrawal (after allowance for investment earnings).
(Trust Indenture Sec. 4.04(b), p. 18). BANCOHIO notified GILLETTE of its default. GILLETTE failed to cure, and BANCOHIO exercised its option to accelerate future payments.
TONN & BLANK ceased construction activity in December, 1985. Mechanic's liens were filed. Tonn and Blank's lien was for Five Hundred Twenty-Two Thousand, Eight Hundred Forty-Three & 70/100 Dollars ($522,843.70). Ten subcontractors of Tonn & Blank filed liens totalling Four Hundred Thirty Thousand, One Hundred Seventy-Four & 98/100 Dollars ($430,174.98). The nursing home was only partially completed and without patients.
On March 18, 1986, TONN & BLANK filed a complaint in The United States District Court for the Northern District of Ohio against GILLETTE, EVERSOLE, STEIN, BANCOHIO, and others, claiming liens on the project. (Tonn & Blank, Inc., v. Gillette Assoc., Case C86-1041-Y). BANCOHIO filed its Answer, Counterclaim and Crossclaims seeking, among other things:
1. A joint money judgment against GILLETTE and STEIN in the principal sum of Two Million, Six Hundred Ten Thousand Dollars ($2,610,000.00), plus interest; and
2. Foreclosure of the mortgage and sale of the project.
On April 10, 1987, the District Court entered summary judgment against STEIN, EVERSOLE and GILLETTE, jointly and severally, in favor of TONN & BLANK in the principal amount of Seven Hundred Thousand Dollars ($700,000.00). None of the parties appealed the judgment. On April 20, 1987, the District Court entered *869 summary judgment in favor of BANCOHIO against GILLETTE and STEIN, jointly, in the amount of Two Million, Five Hundred Forty-Five Thousand, One Hundred Seventy-One & 62/100 Dollars ($2,545,171.62), plus interest from August 15, 1986.
Shortly after commencement of the District Court suit, subcontractors of TONN & BLANK, filed suits in Trumbull County Court of Common Pleas. (Polivka Paving v. Tonn & Blank, Inc., Case 86-CV-398); Firefoe v. Tonn & Blank, Inc., Case 86-CV-1390).[2]
Among STEIN's personal assets was a partnership interest in POST LAND COMPANY. The sum of One Million, One Hundred Fifty-Eight Thousand, Four Hundred Ninety-Five & 59/100 Dollars ($1,158,495.59) was about to be disbursed to STEIN from POST LAND COMPANY from the sale of another nursing home facility. On May 5, 1987, the Trumbull County Court of Common Pleas issued a Charging Order in favor of BANCOHIO making STEIN's interest in the POST LAND COMPANY subject to the judgment in favor of BANCOHIO.[3] Subsequently, TONN & BLANK and CORTLAND SAVINGS & BANKING COMPANY, another creditor of STEIN, challenged BANCOHIO's attachment of STEIN's partnership interest. The Common Pleas Court ordered that the POST LAND COMPANY monies be deposited with the Clerk of the Court until the priorities were determined. On June 5, 1987, the Common Pleas Court entered an Order directing that the entire amount of money deposited with the Court be disbursed to BANCOHIO. On June 10, 1987, TONN & BLANK filed a Notice of Appeal of the decision and a Motion for a stay of the judgment pending appeal. The Court of Appeals granted TONN & BLANK's stay of the judgment pending appeal.[4] On June 19, 1987, both GILLETTE and STEIN filed Chapter 11 Petitions in the United States Bankruptcy Court for the Northern District of Ohio. At the time of the Petition filings, Debtor had managed to complete construction of the project and had 17 patients.
After filing the Petitions for Reorganization under Chapter 11, STEIN sought Bankruptcy Court authority to use a portion of the POST LAND COMPANY funds on deposit with the Trumbull County Court to assist in Debtors' reorganizational efforts. On June 23, 1987, we determined that BANCOHIO's claim was adequately secured by the GILLETTE nursing home and ordered the POST LAND COMPANY funds transferred to a debtor-in-possession interest-bearing account at BANK ONE OF EASTERN OHIO, N.A. ("BANK ONE"). Further, the STEIN estate was authorized to loan up to Eighty Thousand & 00/100 Dollars ($80,000.00) of the POST LAND COMPANY funds to the GILLETTE estate for operating expenses of the nursing home. Subsequently, STEIN was also permitted to use portions of the POST LAND COMPANY funds for personal living expenses. After establishment of the BANK ONE account, additional POST LAND COMPANY funds amounting to approximately Two Hundred Fifty Thousand & 00/100 Dollars ($250,000.00) were deposited to the account.
In September 1987, GILLETTE and STEIN filed with this Court an Application to borrow money and compromise controversy. The Application proposed a settlement of the claim of TONN & BLANK, and included the releases of all subcontractor claims and liens against the GILLETTE project. On November 2, 1987, this Court approved the Application under the following conditions:
1. STEIN was authorized to lend to GILLETTE from the POST LAND COMPANY funds, and GILLETTE was authorized to borrow from STEIN, the sum of Five Hundred Ninety-Five Thousand & 00/100 Dollars ($595,000.00). STEIN was *870 granted an administrative expense priority for this amount.
2. STEIN was directed to pay counsel for TONN & BLANK, as escrow agent, the sum of Five Hundred Ninety-Five Thousand & 00/100 Dollars ($595,000.00), which constituted full satisfaction of all claims between TONN & BLANK and the Debtors. (A mutual release was executed by both TONN & BLANK and the Debtors).
3. TONN & BLANK was required to release its liens on all property of the Debtors and cause the discharge of liens of all subcontractors of TONN & BLANK against the Debtors and indemnify the Debtors against any judgment or cause regarding any subcontractor lien which was not discharged.
4. Upon payment of the sum of Five Hundred Ninety-Five Thousand & 00/100 Dollars ($595,000.00), TONN & BLANK was required to assign to the Debtors all of its rights to all claims which are or may be owed or claimed to be owed to TONN & BLANK by STEIN, EVERSOLE and/or GILLETTE.
At the present time, construction of the project is complete. The nursing home is filled to capacity and has a waiting list of prospective patients. GILLETTE has accumulated at least Six Hundred Fifty Thousand & 00/100 Dollars ($650,000.00) over and above its operating costs.

THE PLANS
A. Plan of BancOhio. BANCOHIO's "reorganization" plan is actually a plan to liquidate both GILLETTE and STEIN. Confirmation of the BANCOHIO Plan would approve a sale of the GILLETTE ASSOCIATES nursing home project to WARREN GENERAL HEALTH CARE PROPERTIES, an Ohio general partnership ("WARREN GENERAL") for Three Million & 00/100 Dollars ($3,000,000.00).[5] To implement the BANCOHIO Plan, the Court would require Debtors to deliver to WARREN GENERAL:
1. Full possession of the project land, buildings, and structures and fixtures with good and marketable title.
2. All tangible personal property used by Debtors in the operation of the project, including supplies and inventory, with good and marketable title.
3. Authority to operate under the Certificate of Need granted to Debtors by the State of Ohio Health Planning Development Agency.
4. Debtors' consent to the transfer and surrender of Debtors' Medicaid provider number to WARREN GENERAL.
5. Debtors' consent to WARREN GENERAL (and/or its lessee) to operate under Debtors' license to operate as a 100-bed intermediate care nursing home.
6. All other permits, licenses, franchises, consents, and other authorizations necessary for operation of the project.
7. Such service and maintenance and executory contracts as WARREN GENERAL may elect.
8. A guarantee that Debtors will be responsible for correcting any deficiencies resulting from a change of ownership inspection by the State of Ohio.
It is unclear whether applicable Ohio law requires the personal consent of the permit holder to insure continued validity of the assigned or transferred licenses and permits. That STEIN would voluntarily consent to his own involuntary liquidation is questionable. If he would not, the use of contempt powers to force those acts, especially *871 with the factual background here found, would seem at the very least to be harsh, Sec. 1142 notwithstanding. BANCOHIO projected sources of funding for its Plan as follows:[6]

 SOURCE AMOUNT
Net proceeds from sale of GILLETTE
 nursing home facility to
 WARREN GENERAL $ 390,000.00[7]
Cash from GILLETTE operations after
 payment of post-Petition operating
 expenses 680,000.00[8]
Remainder of STEIN's POST LAND
 COMPANY funds 813,800.00[9]
Sale of Horses owned by STEIN 49,000.00
Veres Judgment 155,000.00
 _____________
 TOTAL FUNDS AVAILABLE $2,087,800.00[10]
 =============

The BANCOHIO Plan projects disbursement of Two Million, Six Hundred Ten Thousand Dollars ($2,610,000.00) as bond principal and other disbursements of One Million, Nine Hundred Ninety-Six Thousand, Six & 97/100 Dollars ($1,996,006.97), plus an unknown amount to satisfy administrative expenses. The BANCOHIO Plan proposes to pay 100 percent (100%) on all claims, including the following amounts to itself:
1. Principal and interest owing to BANCOHIO as indenture trustee for the bond holders as of June 19, 1987 in the amount of Two Million, Eight Hundred Sixty-Three Thousand, Three Hundred Eighty-Six & 96/100 Dollars ($2,863,386.96).[11]
2. Post-Petition interest of Five Hundred Twenty-One Thousand, Five Hundred Five & 72/100 Dollars ($521,505.72) to bond holders.[12]
3. Fees and expenses of the indenture trustee as of June 19, 1987, totalling Thirty-Three Thousand, Seven Hundred Forty-Six & 33/100 Dollars ($33,746.33).[13]
4. Fees and expenses of the attorney for the indenture trustee as of June 19, 1987, of One Hundred Thousand, Eighty & 29/100 Dollars ($100,080.29).[14]
5. Expenses incurred in United States District Court Case C86-1041-Y totalling Thirty Thousand, Three Hundred Ninety-Seven & 28/100 Dollars ($30,397.28).[15]
6. A projected and estimated administrative claim of One Hundred Fifteen Thousand & 00/100 Dollars ($115,000.00).[16]
B. Plan of Debtors. Debtors' Plan also provides for a 100 percent payment to all allowed claims. Debtors set forth the source of funding for their Plan as follows:[17] *872 

Gillette- Cash accumulated from $ 650,000.00[18]
 post-Petition earnings
Stein-Cash on hand at Bank One 744,000.00[19]
Cortland Savings & Banking Co. 275,000.00[20]
Stein Equity in Business Real Estate
 (Noble Romans & Long John Silvers) 200,000.00
Veres Judgment 155,000.00
 _____________
 $2,024,000.00
 =============

BANCOHIO concluded in its Post-Hearing Brief that Debtors would require One Million, Four Hundred Ninety-Nine Thousand, Two Hundred Seventy-Three & 46/100 Dollars ($1,499,273.46) at confirmation to implement its Plan. The Official Bond Holders Committee estimated the figure at One Million, Five Hundred Seventeen Thousand, Two Hundred Seventy-Three & 86/100 Dollars ($1,517,273.86) in its March 6, 1989 Brief and One Million, Six Hundred Nineteen Thousand, Seven Hundred Eight Dollars ($1,619,708.00) in its March 16, 1989 Brief. Whether using Debtors' figures, BANCOHIO's figures, or the Bond Holder's Committee's figures, Debtors appear to have sufficient funds to implement their Plan.

DISCUSSION
Chapter 11 is designed to accommodate confirmation of both consensual Plans and those which do not receive the acceptance of all the various classes. To qualify as confirmable, a plan must satisfy all the requirements of 11 U.S.C. Sec. 1129. That section provides two means by which a plan may be confirmed. The first requires satisfaction of all subsection (a) requirements, including (a)(8), which necessitates acceptance of the plan by all impaired classes of claims or interests. The second means, in addition to incorporating all requirements of subsection (a), except for (a)(8), requires the plan not unfairly discriminate, that it be fair and equitable with respect to each class of impaired claims or interests that has not accepted the plan, and that with respect to unsecured claims, no claims junior to unsecured creditors receive an interest in property under the Plan. 11 U.S.C. Sec. 1129(b).
Sec. 1129 lists twelve (12) prerequisites to the confirmation of a Chapter 11 plan. The first of these is that "the plan complies with the applicable provisions of this Chapter." 11 U.S.C. Sec. 1129(a)(1). The drafters envisioned that "paragraph (1) requires that the plan comply with the applicable provisions of Chapter 11, such as Secs. 1122 and 1123, governing classification and contents of plan." H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977), S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code & Admin.News, 1978, pp. 5787, 5912, 6368; see also 5 Collier on Bankruptcy, para. 1129.-02[1] (15th ed. 1987). Title 11 U.S.C. Sec. 1122 addresses classification of claims and provides, in pertinent part:
(a) . . . A plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
Classification is a method of recognizing a difference in rights of creditors which calls for a difference in treatment. The focus of classification is the legal character of the claim as it relates to the assets of the debtor. J.P. Morgan & Co. v. Missouri Pacific Railroad, 85 F.2d 351, 352 (8th Cir.1936), cert. denied 299 U.S. 604, 57 S.Ct. 230, 81 L.Ed. 445 (1936).
Unlike the Debtors' Plan, the BANCOHIO Plan lumps together the claims of the bond holders with the claims of the indenture trustee. Claims of the *873 indenture trustee include entitlement to post-Petition interest, fees and expenses and advances, along with attorney's fees. This classification is inconsistent with the requirements of 11 U.S.C. Sec. 1122(a). The claims of the bond holders are a matter of contract and are not subject to alteration by the Court. As the court stated in U.S. Truck Co., Inc., 42 B.R. 790, 796 (Bankr.E. D.Mich.1984):
Pre-petition claims arising out of ordinary contractual relationships are closed  they have occurred and the damages are measurable (or estimatable).
The language used by the U.S.Truck court aptly describes the claims of the bond holders here. However, the indenture trustee's claims, even though arguably arising under the same contract, are not closed. They are what the U.S. Truck court termed "open ended" in character. The fees and expenses of the indenture trustee and its attorneys continue to accrue in these proceedings. Unlike the claims of the bondholders, the fees and expenses of the indenture trustee, both pre- and post-Petition, are subject to the review of this Court and are of a substantially different legal character than the claims of the bond holders. Perhaps the difference in the interests of the indenture trustee and of the bond holders in the assets of the Debtors is most evident when one considers the standard of review which the indenture trustee's entitlement to the Debtors' assets will be judged. The Court will consider the claim of the indenture trustee to attorney fees in light of the extent to which the services rendered were contemplated by contract and the extent to which they benefitted the Debtors' estate. This standard of review is inappropriate with respect to the interests of the bond holders. Because the BANCOHIO Plan contains a classification which is not internally homogeneous, the Plan is nonconfirmable for having failed to meet the requirements of 11 U.S.C. Sec. 1129(a)(1).
The remainder of this Opinion will deal mainly with an analysis of how the Debtors' Plan meets the requirements for confirmation contained in 11 U.S.C. Sec. 1129. Since a reviewing court may disagree with our holding striking the BANCOHIO Plan on the basis of an improper classification, we consider the other reasons why the Debtors' Plan is to be preferred to the BANCOHIO Plan. Thus, a reviewing court will have before it this Court's reasoning on all aspects of confirmation.
11 U.S.C. Sec. 1129(a)(2) requires that the proponent of the Plan comply with the applicable provisions of Chapter 11. Both Plan proponents appear to comply with this requirement.
11 U.S.C. Sec. 1129(a)(3) requires that the Plan be proposed in good faith and not forbidden by law. Both parties here have complained of a lack of good faith on the part of the other. The term "good faith" is left undefined by the Code. However, in the context of a Chapter 11 reorganization, a plan is considered to be in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr.S.D.N. Y.1984); accord In re White, 41 B.R. 227, 229 (Bankr.M.D.Tenn.1984). BANCOHIO does not violate the good faith requirement solely because it has proposed a liquidation plan. There has been no evidence that BANCOHIO does not have a reasonable belief that the Debtors' liquidation is in the Bank's best interest. See 5 Collier on Bankruptcy, 1129.02[3] (15th ed. 1987). We find that both plans are proposed in good faith.
There appears to be no issue with respect to 11 U.S.C. Sec. 1129(a)(4), (5) and (6).[21]
*874 11 U.S.C. Sec. 1129(a)(7) raises an issue for determination. It provides:
(7) With respect to each impaired class of claims or interests 
(A) Each holder of a claim or interest of such class 
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.
There are three ways in which a plan can meet the requirements of Sec. 1129(a)(7):
(1) Under this section and Sec. 1126(f), all members of an unimpaired class are deemed to accept the plan; or
(2) All members of a class may affirmatively vote to accept the plan; or
(3) Each nonaccepting member of the class receives at least as much as would be received in a Chapter 7 liquidation of the Debtor.
In determining whether the Plans meet the specifications of Sec. 1129(a)(7), we examine the Plans from the perspective of each of these three requirements.
First, we must determine which classes are "unimpaired" under the Debtors' Plan and may be deemed to have affirmatively accepted. Class A consists of administrative expenses entitled to priority pursuant to 11 U.S.C. Sec. 507(a). As this is a class required by statute to be paid in full on confirmation, the class is unimpaired. Class B-1 consists of the allowed secured claim of BANCOHIO on behalf of the bond holders, excluding any portion of the claim provided for in Class B-2. Debtor proposes to cure in full any default which occurred before or after the commencement of this case, without acceleration; to reinstate the maturity of such claims as they existed prior to default and to compensate the holders for damages incurred as a result of the default within ten (10) days of confirmation. Debtors allot that this arrangement will leave unaltered the legal, equitable and contractual rights to which the bond holders are entitled. THE OFFICIAL BOND HOLDERS COMMITTEE and BANCOHIO complain that the Debtors' failure to provide for the complete replenishment of the Debt Service Reserve Fund results in leaving Class B-1 impaired.
The concept of "impairment of a claim or interest under a debtor's plan of reorganization" is defined in 11 U.S.C., Sec. 1124. This section provides that a claim is impaired under a plan of reorganization unless the plan (1) does not alter any of the claimants' contractual rights; (2) cures any default; (3) reinstates the maturity of a claim to its pre-default status; and (4) compensates the claimants for damages incurred due to their reasonable reliance on a particular contractual provision or applicable law. The Trust Indenture and Loan Agreement require Debtors to begin repayment to the Debt Service Reserve Fund in the month following the month of default. The repayment is scheduled to take place over the course of a year in equal monthly installments. See Trust Indenture, Sec. 4.04(b) and Loan Agreement, Sec. 2.1(c)(1). Debtors propose to deposit a sum equal to one-twelfth (1/12th) of the Two Hundred Sixty-Two Thousand Dollars ($262,000.00) required to bring the Debt Service Reserve Fund to its required balance of Two Hundred Ninety-Five Thousand Dollars ($295,000.00) at confirmation and to pay the remainder due in eleven further installments.
In a widely followed opinion, In re Taddeo, *875 685 F.2d 24 (2d. Cir.1982),[22] the Second Circuit established that the concept of curing defaults under Sec. 1124 necessarily includes the power not only to "deaccelerate" and reinstate the original terms of a debt, but also to restore the relative positions of the parties to their pre-default state. A default is an event in a debtor/creditor relationship which triggers certain consequences  here, acceleration.
Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are, thus, nullified. This is the concept of `cure' used throughout the Bankruptcy Code.
Id. at 26-27. Although the creditors' rights arising out of acceleration are, in fact, affected by cure and reinstatement, they are deemed unimpaired. See, e.g., In re Forest Hills Assoc., 40 B.R. 410, 414 (Bankr.S.D.N.Y.1984); In re Madison Hotel Assoc., 29 B.R. 1003, 1006 (Bankr.W.D. Wis.1983); In re Masnorth Corp., 28 B.R. 892, 894; In re Barrington Oaks General Partnership, 15 B.R. 952 (Bankr.D.Utah 1981).
It is, thus, clear that Code Sec. 1124(2) provides the debtor-in-distress with the statutory tools necessary to effect a total healing of the scars of contractual default by placing the parties into the same position as they were immediately before the default occurred. This healing is accomplished by paying the creditor whatever he would have received under the contract had the debtor not defaulted. The creditor is nevertheless rightfully categorized as unimpaired, for he is returned to the same position he was in immediately prior to the default and is thereby given the full benefit of his original bargain.
THE OFFICIAL BOND HOLDERS COMMITTEE and BANCOHIO next complain that the Debtors' conveying of a second mortgage against the project assets to CORTLAND impairs the bond holders' class. They opine that the Trust Indenture and Loan Agreement preclude a second mortgage on the property. However, these instruments do not preclude a second mortgage where the indenture trustee agrees to a second mortgage. 11 U.S.C. Sec. 1123(a)(5)(E) provides that "a plan shall provide adequate means for its execution, such as satisfaction or modification of any lien." Collier explains that "the plan may propose such actions notwithstanding nonbankruptcy law or agreements." 5 Collier, para. 1123.01[5] at 1123-10 (15th ed. 1987). 11 U.S.C. Sec. 1142 provides for plan implementation by directing the debtor and any other necessary party to:
execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, . . . that is necessary for the consummation of the plan.
Thus, it is permissible under the Code for the contract provision permitting a modification to be effectuated. The bond holders have little cause to complain where they are to receive full repayment of all sums due and owing. Permitting the second mortgage neither alters, diminishes, nor enhances rights under the contract. Under these circumstances, the second mortgage does not constitute an impairment.
THE OFFICIAL BOND HOLDERS COMMITTEE further argues that the seventh-year balloon payment to CORTLAND BANK serves to impair the interests of the bond holders. THE OFFICIAL BOND HOLDERS COMMITTEE could not describe in particular how this served as an impairment, and the Court declines to speculate.
Debtors' Classes B-2, C, F, and G are proposed to be satisfied in full within forty-five (45) days of the effective date of the Plan or, in the event of an objection to a claim in one of these classes, payment is *876 to be made within twenty (20) days of the allowance of such claim by final Order of the Court. These classes do not appear to be impaired and no objections have been made with respect to these classes. The remaining class, Class D, consists of STEIN. As an insider, STEIN's acceptance is immaterial with respect to satisfying the requirements of Sec. 1129(a)(7).
Since we have determined there are no impaired classes under the provisions of Sec. 1129(a)(7), the Plan meets the requirements of Sec. 1129(a)(8), which requires that each class of claims or interests accept the plan or be found to be not impaired under the plan. Secs. 1129(a)(9) and (10) are not relevant to our discussion here.[23]

CLAIM OF BANCOHIO
A. Positions of the Parties. BANCOHIO filed its Proof of Claim on September 28, 1987. Debtors objected to the claim on December 7, 1988, on the following bases:
(1) The amount of the claim is in excess of that owed by debtors and a full and detailed accounting with respect to all credits and debits upon charges assessed against debtors has not been provided.
(2) Included in such claims are charges for penalties, service fees, and attorney fees which are excessive, not allowable as provided by applicable provisions of law, or the underlying contractual relationship between debtors and claimant.
BANCOHIO responded to the Objection on January 23, 1989. By Order of March 8, 1989, we directed the parties to submit whatever supplementation the parties deemed necessary on the issue of BANCOHIO's Proof of Claim prior to the close of business on March 14, 1989. Thereafter, the Court would consider the matter on the papers filed. Both parties made supplemental filings; Debtors filed a brief on March 14, 1989, and BANCOHIO responded to it on March 16, 1989.
In its January 23, 1989 response, BANCOHIO clarified that it is relying upon Sec. 506(b) of the Bankruptcy Code to support its claim for pre-petition fees and expenses. Sec. 506(b) provides:
(b) To the extent that an allowed secured claim is secured by property, the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
Sec. 2.1(C)(ii) of the Loan Agreement set forth the contractual terms under which GILLETTE might be obliged for fees and expenses, as follows:
(C) To the Trustee [BANCOHIO], the reasonable fees, charges and expenses of the trustee as Trustee, bond registrar, and paying agent, and of any other paying agent on the Bonds under the Indenture; all as provided in the *877 Indenture, as and when the same become due; provided that the Company may, without creating a default hereunder, contest in good faith the necessity of any Extraordinary Services and Extraordinary Expenses as such terms are defined in the Indenture, and the reasonableness of any such fees, charges, or expenses.[24]
The open-end mortgage and security agreement provided for securing BANCOHIO's fees with the first mortgage.[25] The loan agreement specifically provided that attorney's fees and expenses incurred by BANCOHIO are "expenses" of the trustee.[26]
With respect to post-Petition fees and expenses, BANCOHIO asserts an entitlement to allowance of an administrative claim. BANCOHIO relies on Sec. 503(b)(3)(D) and Sec. 503(b)(4) in this regard.[27] These provisions of Sec. 503 provide as follows:
(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under Sec. 502(f) of this title, including 
* * * * * *
(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by 
* * * * * *
(D) a creditor, an indenture trustee, equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under Sec. 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; . . .
(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expenses allowable under paragraph (3) of this subsection, based on the time, the *878 nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.
B. Amounts Claimed by BANCOHIO. BANCOHIO set forth the "four basic components" to its claim.[28]
1. Principal and interest owing to the bond holders.
2. Unreimbursed advances totalling Eight Thousand, Nine Hundred Twenty-Nine & 25/100 Dollars ($8,929.25) made by BANCOHIO pursuant to October 3, 1986 Order of Judge Dowd.
3. The fees and expenses of BANCOHIO for the services it has rendered in administering the bond issue and responding to the bond default.
4. The attorney's fees and expenses incurred by BANCOHIO as a result of the bond default.
Each of these components is discussed separately below.
1. The portion of the claim seeking principal and interest owing to the bond holders is not in dispute. Debtors' Plan provides for full payment of interest arrearages and for replenishment of the Debt Service Reserve Fund pursuant to the terms of the agreement between the parties. Accordingly, this portion of the claim is allowed.
2. The portion of the claim relating to unreimbursed advances made by BANCOHIO, purportedly pursuant to an Order of Judge Dowd, is disallowed. The Proof of Claim set forth a lump-sum figure of Thirty Thousand, Three Hundred Ninety-Seven & 29/100 Dollars ($30,397.29). In response to Debtors' objections seeking a detailed breakdown of the items paid, BANCOHIO reduced the amount due to Eight Thousand, Nine Hundred Twenty-Nine & 25/100 Dollars ($8,929.25). BANCOHIO explained, "[s]ince the Proofs of Claim were filed, adjustments have been made for additional debits and credits."[29] None of the exhibits submitted by BANCOHIO contains a list of the items which constitute the Thirty-Thousand, Three Hundred Ninety-Seven & 29/100 Dollars ($30,397.29), nor accounts for the "credits", nor does any set out BANCOHIO's authority to apply credits to the amount claimed. The claim fails for lack of proof.
3. The third component of the claim relates to fees and expenses incurred by BANCOHIO, other than attorneys' fees and expenses. BANCOHIO contends, and the Court agrees, that its claim for pre-Petition fees and expenses is governed by 11 U.S.C. Sec. 506(b). We find that the estate has a value greater than the pre-Petition amounts claimed.[30] Therefore, the Court may consider the pre-Petition fees and expenses based on their reasonableness in light of the contract between the parties. "Ordinary Services" and "Ordinary Expenses" total Ten Thousand, Three Hundred Sixty-Five & 57/100 Dollars ($10,365.57). The charges are detailed in Exhibit 3 to BANCOHIO's January 23, 1989 Response Brief and are not disputed. This portion of the claim is allowed as reasonable fees and expenses contemplated by the parties' contract. The portion of the claim relating to Extraordinary Fees and Expenses is disallowed. The Trust Indenture specifies that:
If such Extraordinary Services or Extraordinary Expenses are occasioned by the neglect or misconduct of the Trustee, it shall not be entitled to compensation or reimbursement therefor.[31]
As BANCOHIO pointed out, `Allowance of reasonable fees and expenses pursuant to Sec. 506(b) is a matter of federal, not state, law.'[32]
*879 The burden of proof to show entitlement to fees is always on the applicant. In re Lindberg Products, Inc., 50 B.R. 220, 221 (Bankr.N.D.Ill.1985); In re Harman Supermarket, Inc., 44 B.R. 918, 920 (Bankr.W.D.Va.1984); In re Horn & Hardart Baking Co., 30 B.R. 938, 939 (Bankr. E.D.Pa.1983). Since every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or for use by the debtor, this burden is not to be lightly regarded. In re Hotel Assoc. Inc., 15 B.R. 487, 488 (Bankr.E.D.Pa.1981). Here, Debtors raised serious allegations concerning misapplication of bond proceeds. Debtors alleged that BANCOHIO did not adhere to the procedures outlined in Item 4.4 of the Loan Agreement in making disbursements. Because of this breach, Debtors lacked sufficient funds to allow a timely completion of construction. Debtors particularly raised questions and requested substantiating documentation for the following disbursements:[33]
1. $52,762.60 on 10/31/84 to International Construction Company.
2. $50,000.00 on 01/14/85 to International Furnishings Corporation.
3. $125,000.00 on 01/23/85 to International Furnishings Corporation.
4. $27,950.00 on 04/22/85 to International Furnishings Corporation.
5. $38,536.66 on 05/29/85 to International Furnishings Corporation.
6. $15,806.00 on 07/23/85 to International Construction Corporation.
7. $31,688.00 on 07/11/85 to International Construction Corporation.
8. $35,000.00 on 08/22/85 to Health Resources Management Corporation.
9. $15,500.00 on 08/29/85 to Kenneth Eversole.
10. $30,000.00 on 09/25/85 to Kenneth Eversole.
In spite of the seriousness of these allegations, BANCOHIO provided no information to Debtors or the Court concerning the propriety of its disbursements, or the manner in which the disbursements were made. As discussed earlier, even when faced with what one would expect to be a simple matter of itemizing the advances it claimed to have made, BANCOHIO chose to rest on responding with a different figure, also with no verification. Patently, BANCOHIO has failed to carry its burden to show entitlement to Extraordinary Fees and Extraordinary Expenses under its agreements with GILLETTE.
Even if we had found that the record supported a finding that the Bank met its burden of proof on the issue of neglect or misconduct in its disbursements, we would still be compelled to disallow the claim for Extraordinary Fees. Under Sec. 506(b), BANCOHIO is only entitled to those fees, costs, or other charges this Court deems "reasonable". The only documentation concerning the fees is contained in Exhibit 3 to the January 23, 1989 Response Brief. That Exhibit contains insufficient information for the Court to make a determination as to the reasonableness of the charges. The Exhibit is devoid of information concerning the dates on which time was spent or the nature of the activity. The standards which this Court is obliged to follow on the "reasonableness" issue were clearly set out in the cases which BANCOHIO itself cited to the Court.[34] We can only guess why BANCOHIO did not supply the documentation required for a "reasonableness" determination and we decline to render judgments based on guesses.
4. The last component of BANCOHIO's claim consists of its demand for pre-Petition attorney fees and expenses under 11 U.S.C. Sec. 506(b). Sec. 9.4 of the Loan Agreement (quoted infra at f. 25) provides that BANCOHIO is entitled to "reasonable" attorney's fees and expenses incurred as a result of a default by GILLETTE. BANCOHIO's burden under this Section appears to be less than its burden under Sec. 7.02 of the Trust Indenture. *880 Sec. 9.4 contains no requirement that BANCOHIO demonstrate that it was not neglectful nor guilty of misconduct. Debtors chose not to submit evidence on this issue.[35] Therefore, we proceed with an analysis of the reasonableness of the pre-Petition attorney fees and expenses. Even though BANCOHIO has maintained that its entitlement to pre-petition fees and expenses is governed by Sec. 506(b), and its entitlement to post-Petition fees and expenses is governed by Sec. 503(b)(3)(D) and Sec. 503(b)(4), BANCOHIO has not provided the Court with a document containing a breakdown of the amounts sought for pre-Petition fees and expenses and those sought for post-Petition expense fees and expenses. Rather, it is necessary to combine the Proof of Claim filed September 28, 1987, and the breakdowns of charges in the Response Brief filed January 23, 1989.[36] The Proof of Claim provides lump-sum figures through June 19, 1987, which are presumably the pre-Petition figures. By subtracting these figures from figures contained in the January 23, 1989 Response Brief, purporting to be totals through December 31, 1988, we arrive at the post-Petition claim. The breakdown is as follows:

 Fees and Fees and
 Expenses at Expenses at Post-Petition
 06/19/87 12/31/88 Claim 
 (Proof of Claim (Brief Filed
 filed 09/28/87) 01/23/89)
Attorney Fees 137,477.57 226,911.83 89,434.26.

BANCOHIO did not provide a breakdown of the hourly rates charged for those performing services. By dividing the total hours reported (1,922) into the total fees charged ($209,805.00), we determined the blended average rate to be $109.16 per hour for work performed by both professional and para-professional personnel. Based on the type of work performed, we conclude that an average hourly rate of $109.16 is reasonable. We have reviewed the detailed bills submitted by BANCOHIO's attorneys on a line-by-line basis. Appendix 1 contains the Court's determination of hours disallowed and the Court's reason for each such disallowance.[37] In summary, a total of 979.1 hours were charged for services through June 19, 1987. We have disallowed 193.3 of these hours. The Court deducted as unreasonable all time which appeared to be charged for the attorneys within the law firm talking with one another where the need for multi-attorney conference is not shown or where the attorneys' time charges for the same conference are differing. These are denoted on Appendix 1 as "interoffice communication." Approximately one-half of the hours charged for paralegals was deducted, as an hourly rate of $109.16 is believed excessive for paralegal activity. Further, we have reduced the travel time charges, finding that $109.16 is excessive for travel. Deductions are made where it is impossible to determine whether the charge was reasonable from the description provided, or where two attorneys or more appeared to charge for identical work and no explanation of the need for two or more attorneys was provided.
*881 Expenses charged through the time of the filing of the Petition appear to be in the neighborhood of $8,500.00. These expenses are disallowed in their entirety. BANCOHIO is represented by sophisticated counsel who cited the appropriate cases and standards to be applied by this Court.[38] Well-settled case law indicates that a court cannot merely rubberstamp charges as reasonable where no indication of the amounts charged is provided. For example, we were not advised why outside professional services were needed, or what they were. We are unadvised concerning the necessity for delivery services and computer-assisted research. We do not know what court fees were paid, or where, or the amounts charged for copies, telecopies, or the rate of charges for telephone and travel. As we noted earlier, the burden is on the applicant. BANCOHIO has not carried its burden.
With respect to BANCOHIO's claim to entitlement to administrative expenses under 11 U.S.C. Sec. 503, the claim is denied in its entirety. The burden of proving entitlement to an administrative expense is on the claimant and the standard of proof is a preponderance of the evidence. In re 1 Potato 2, Inc., 71 B.R. 615 at 618 (Bankr.D. Minn.1987) (citing Matter of Patch Graphics, 58 B.R. 743, 746 (Bankr.W.D.Wisc. 1986). Section 503 requires a showing of a "substantial contribution" to the bankruptcy estate. BANCOHIO has made no such showing. We agree with the analysis and conclusions reached by the court in In re Rockwood Computer Corp., 61 B.R. 961 (Bankr.S.D.Ohio 1986). There, fees of the indenture trustee were disallowed because the court found that the indenture trustee did not make a "substantial contribution" as required under Sec. 503. The court stated:
. . . We do not believe that the `substantial contribution' required by Sec. 503(b)(4) is to be found in connection with the performance of the normal tasks required of counsel representing the proponent of a Chapter 11 plan. The formulation of a disclosure statement and plan, of course, falls into this category. Where the disclosure statement and plan are presented by the debtor which is represented by an attorney appointed by the court pursuant to Sec. 330, that attorney is entitled to compensation for that work. Another attorney who contributes to these matters is merely performing an activity [which] amounts to the performance of some function or duty of the trustee, debtor-in-possession, or other officer of the estate, and compensation should not be awarded to such a claimant.
Here, both the Debtors and the bond holders are represented by counsel appointed by the Court pursuant to 11 U.S.C. Sec. 330. The Indenture Trustee did not seek appointment under Sec. 330. It has not and cannot demonstrate that its services were of a benefit to the Debtors' estate or to the other creditors. Its opposition to use of the POST LAND COMPANY funds and to the compromise with TONN & BLANK increased both the Debtors' and TONN & BLANK's expenses. It appears the services were performed primarily for the benefit of BANCOHIO and did not make a substantial contribution in this case.
In addition to reasons already discussed, there are other reasons for preferring Debtor's Plan over that proposed by BANCOHIO. Because some of these reasons also serve to support our conclusion that BANCOHIO did not make a substantial contribution to this case, we believe a brief articulation of these reasons is appropriate.
The Debtors' Plan is consistent with the purpose of Chapter 11, which provides an alternative to liquidation. As the Supreme Court acknowledged in NLRB v. Bildisco and Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Bankruptcy Court is a court of equity, but in performing its equitable duties the Court must focus on the ultimate goal of Chapter 11. In the Supreme Court's view,

*882 The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources. See H.R.Rep. No. 95-595, p. 220 (1977).
465 U.S. at 527-28, 104 S.Ct. at 1196-97 (1984). This view was reinforced in United States v. Whiting Pools, Inc., 462 U.S. 198 at 203, 103 S.Ct. 2309 at 2312-13, 76 L.Ed.2d 515, where the court stated:
. . . By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H.R.Rep. No. 95-595, p. 220 (1977). Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if `sold for scrap.'
A harmonizing view was expressed by the Sixth Circuit in Matter of Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985). There, the court stated:
The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state.
See also Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); In re Nite Lite Inns, 17 B.R. 367 (Bankr.S.D.Cal.1982) (Liquidation plans should be secondary concerns unless debtor chooses such a course or the necessities of justice require it).
Debtors' Plan is fair and equitable. It proposes to pay all creditors in full. BANCOHIO's proposal to liquidate both GILLETTE and STEIN is not fair and equitable to these Debtors. Liquidation would deprive STEIN of the opportunity to recoup his investment of time, close to 1.4 million dollars in advances, and his lifetime savings and livelihood. Further, STEIN testified to the receipt of offers for the GILLETTE facility of 3.1 million, 3.2 million, 3.3 million, and 3.7 million dollars. WARREN GENERAL, the very buyer proposed in BANCOHIO's liquidation plan, made an offer of 3.2 million dollars prior to the time the facility was in operation. Our Memorandum Opinion of November 2, 1987 found "[t]he 3.1 million dollar offer for the facility represents a minimum evaluation." It is curious that now that the facility is completed, is filled to capacity and has a waiting list of patients, and is showing a profit, BANCOHIO would propose a plan to liquidate GILLETTE and surrender its Certificate of Need and licenses to WARREN GENERAL for a lower 3 million-dollar offer.

FEASIBILITY OF DEBTORS' PLAN
11 U.S.C. Sec. 1129(a)(11) provides:
Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
The standards to be utilized by courts examining the feasibility of plans are set forth in In re Cherry, 84 B.R. 134, 138 (Bankr.N.D.Ill.1988), thusly:
. . . When examining the feasibility of a business operation, the court should consider the adequacy of the capital structure, the earning power of the business, the economic conditions, the abilities of management, the continuity of the present management, and other matters which determine the prospects of the sufficiently successful business operation. In re Clarkson, 767 F.2d 417 (8th Cir. 1985). The plan must offer a reasonable prospect of success and [be] workable. . . . `Success need not be guaranteed.' In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir.1985) (quoting United Properties, Inc. v. Emporium Department Stores, Inc., 379 F2d. 55, 64 (8th Cir.1967).
See also In re U.S. Truck Co., Inc., 800 F.2d 581, 589 (6th Cir.1986); Federal Land Bank of Columbia v. Cheatham, 91 B.R. 377 (E.D.N.C.1988).
First, we find that the continuation of present management would benefit all parties in interest. Debtors' problems stemmed from a lack of funds to complete construction, not from mismanagement of *883 the facility. Once construction of the facility was complete, Debtors were able to begin operations and to maintain the operations in an exemplary fashion. Evidence of management's ability is evident in Debtors' payment of all operating expenses and accumulation of more than Six Hundred Fifty Thousand Dollars ($650,000.00) for distribution on pre-Petition debts. Based on the filings of the parties, the testimony adduced at hearing, and the monthly reports filed by Debtors, we find that the Debtors reasonably can be expected to have future net earnings and cash flow sufficient in amount to meet the restructured obligations.
Second, we find that Debtors' proposed new capital structure, including the relationship of debt to equity, is sound.
For the foregoing reasons and on the authorities cited, the Debtors' Plan is confirmed. An appropriate Order shall issue.

ORDER
For reasons set forth in the Court's Memorandum Opinion entered of even date, the claim of BANCOHIO NATIONAL BANK for principal and interest owing to the bond holders through April 1, 1989, is allowed in full. The claim of BANCOHIO NATIONAL BANK for Ordinary Services and Expenses is allowed in the amount of Ten Thousand, Three Hundred Sixty-Five & 57/100 Dollars ($10,365.57). The claim of BANCOHIO NATIONAL BANK for pre-Petition attorney fees incurred as a result of the bond default is allowed in the amount of Eighty-Five Thousand, Seven Hundred Seventy-Seven & 93/100 Dollars ($85,777.93). The remainder of BANCOHIO NATIONAL BANK's Proof of Claim, and its claim for administrative expenses, is disallowed.
Debtors' First Amended Plan of Reorganization, as modified, is confirmed. Debtors' counsel shall prepare an appropriate Order and submit it to the Court within seven days of entry of this Order.
IT IS SO ORDERED.

*884 APPENDIX 1

Date Description Atty./Hours HOURS DISALLOWED REASON
1/27/86 Telephone conference with Tim Adryan FAS .60
 of BancOhio regarding default.
2/21/86 Telephone conference with Trustee. FAS .20
3/12/86 Telephone conference with Tim Adryan FAS .40
 regarding default.
3/21/86 Telephone conference with Tim Adryan FAS .30
 regarding default.
3/24/86 Review indenture regarding default; FAS 2.60
 meeting with Tim Adryan.
3/24/86 Meeting with client; analyze law; PAP 1.70 .50 Interoffice
 conference with FAS, BWM and MFB; communication
 review documents regarding Certificate
 of Need.
3/24/86 Confer with PAP; research regarding BWM 1.20
 transfers of Certificate of Need; 1.00 Interoffice
 confer with paralegal JMM regarding communication
 review of Certificate of Need
 application at State Health Planning
 and Development Agency ("SHPDA").
3/24/86 Telephone conference regarding MFB .50 .50 No designation of
 partnership law. who conference w/
3/24/86 Review file at SHPDA; confer with
 PAP and BWM. JMM 1.50 .50/.70 Interoffice
 communication/paralegal
3/25/86 Confer with Mike Bigler. PAP .30
3/28/86 Telephone conference with Rhonda FAS .60
 Bernstein and Tim Adryan.
3/31/86 Telephone conference with Rhonda FAS .30
 Bernstein.
4/3/86 Telephone conference with Joe Sesler FAS .20
 and Tim Adryan.
4/4/86 Conference with PAP and JCW. FAS .70 .70 Interoffice
4/4/86 Conference with PAP and FAS. JCW .30 .30 communication
4/4/86 Conference with DJY, FAS and JCW; PAP 1.50 .50
 telephone conference with
 Administrative Review Board and
 SHPDA; research.
 PAGE TOTALS 12.9 4.7
*885
4/9/86 Conference with DJY. PAP .10 .10 Interoffice communication
4/22/86 Telephone conference with Joe Sesler FAS 1.50
 and Kathy Hartner; review complaints
 for foreclosure.
4/23/86 Telephone conference with Atty. Steve FAS .20
 Mershon.
4/23/86 Review pleadings filed by other JCW 1.00
 creditors in federal court and
 Trumbull County.
4/24/86 Telephone conference with Atty. Mike FAS 1.10
 Allison and Joe Sesler of BancOhio.
4/24/86 Confer with FAS and Steve Mershon JCW 2.40 .40 Interoffice communication
 regarding extension; review foreclosure
 pleading; prepare memorandum to file.
4/25/86 Review documents received from JCW .40
 Trustee.
4/28/86 Telephone conference with Trustee. FAS .40
5/3/86 Prepare answer, counterclaim and JCW 3.00
 crossclaim for filing in federal
 court action.
5/5/86 Confer with FAS; revise answer. JCW .50 .20 Interoffice communication
5/5/86 Telephone conference with Joe Sesler FAS .80
 and Kathy Hartner.
5/9/86 Confer with firm attorneys. FAS .80 .80 Interoffice communication
5/9/86 Draft answer, counterclaim and cross-claim JCW 2.90
 in state court foreclosure
 proceeding.
5/14/86 Correspond to Kathy Hartner and attorney JCW 1.00
 Allison regarding status; correspond to
 attorney representing mechanic's lienholders;
 review title policy; confer with
 Dave Sidor.
5/15/86 Telephone conference with Kathy Hartner. FAS .20
5/22/86 Review pleadings - filed by other JCW .20
 parties to foreclosure actions.
5/27/86 Review notice of conference from court; JCW .30
 correspond to Trustee regarding same.
 PAGE TOTAL 16.80 1.5
*886
5/28/86 Review pleadings filed in state court JCW .30
 foreclosure case by Second National Bank.
5/29/86 Confer with attorney Zuzolos' office JCW .30
 regarding update of title information.
6/4/86 Confer with attorney Lorenzetti regarding JCW .30
 title report.
6/5/86 Review reply to BancOhio's counterclaim. JCW .20 .20 Interoffice Communication
6/9/86 Confer with JCW. FAS .20 .20 Interoffice Communication
6/9/86 Review letter from Swink & Company and JCW .60
 pleadings; confer with FAS.
6/11/86 Meeting with Joe Sesler, Noel Knox and FAS 1.20
 Kathy Hartner of BancOhio. .90 Duplicate Charges. No
 explanation of need for
 two attorneys
6/11/86 Prepare for meeting; attend meeting with JCW .90
 Joe Sesler, Noel Knox, Kathy Hartner
 and FAS regarding status and
 strategy.
6/12/86 Prepare for status conference; travel JCW 6.00 2.30 Travel time
 to Akron and attend status conference Interoffice Communication
 before Judge Dowd; correspond to Trustee
 regarding status conference; prepare
 memo to the file regarding same; confer
 with FAS regarding same.
6/16/86 Confer with JCW. FAS .30 .30
6/16/86 Review bond documents and other client JCW 6.10 .50 Interoffice Communication
 provided material; confer with attorney
 Lorenzetti regarding title information;
 confer with DSS and FAS regarding same;
 .30
6/16/86 Confer with JCW; prepare summary of KLW 1.40 .70 Paralegal
 client provided documents.
6/17/86 Confer with JCW regarding disbursement FAS .20 .20 Interoffice Communication
 of funds.
6/17/86 Research regarding priority of open-end JCW 2.40
 mortgage versus mechanic's lien and
 disbursement issues; confer with Kathy
 Hartner regarding account balances.
6/18/86 Prepare letter to Judge Dowd; confer JCW 3.40 .20 Interoffice Communication
 with FAS and Kathy Hartner regarding
 same.
 PAGE TOTAL 23.8 5.80
*887
6/18/86 Review correspondence to Judge Dowd. FAS .20
6/19/86 Confer with Kathy Hartner regarding JCW 3.00
 financial details; finalize letter to
 Judge Dowd.
6/20/86 Review correspondence to Judge Dowd. FAS .60
6/23/86 Telephone conference with JCW FAS .50 .50
 regarding fiduciary duty of Trustee. Interoffice Communication
 .30
6/23/86 Confer with JPW. PAP .30
6/24/86 Prepare for status conference; travel JCW 8.00 3.00 Travel Time
 to Akron; attend status conference;
 confer with Messrs. Sesler, Stein,
 Eversole, Blank, Zimmerman, Budish,
 Dingledy, Landers and Swindall; travel
 to Warren with Joe Sesler to view
 project facility.
6/25/86 Confer with Joe Sesler regarding status JCW 2.20 1.90
 of project; confer with FAS and DBG
 regarding issues raised at status
 conference. Interoffice Communication
6/25/86 Confer with JCW and FAS. DBG .90 .90
6/25/86 Confer with JCW and DBG. FAS 1.90 1.90
6/26/86 Confer with Joe Sesler; review order JCW .50
 regarding status conference and request
 for documents.
6/26/86 Confer with KRM. FAS .40 .40 KRM unknown/unidentified
6/27/86 Telephone conference with Dick Kane and FAS .80
 with Noel Knox regarding insurance.
6/27/86 Confer with attorney Gilligan regarding JCW .40
 pleadings and status; confer with
 attorney Kane regarding bond documents.
6/30/86 Confer with firm attorneys. FAS .40 .40
 .10 Interoffice Communication
6/30/86 Confer with attorney Coleman regarding JCW .30 .10
 bond documents; confer with DBG.
6/30/86 Confer with firm attorney. PAP .10
7/1/86 Telephone conference with Dick Kane. FAS .30
7/1/86 Confer with firm attorneys. JCW .50 .50 Interoffice Communication
 -4- PAGE TOTAL 21.3 10.0
*888
7/2/86 Meeting with Messrs. Sesler, Knox and FAS .50 .50 No explanation re need
 Allison. for two attorneys
7/2/86 Prepare for meeting; meeting with JCW 1.80
 Messrs. Sesler, Knox and Allison.
7/8/86 Confer with MLT regarding question JCW .30 .30 Interoffice communication
 of separate counsel for bondholders.
7/8/86 Confer with MLT. MLT .30 .30
7/9/86 Research. MLT 4.90 4.90 Research not identified
7/9/86 Confer with attorneys Coleman, Gilligan, JCW 1.40 .30 Interoffice communication
 and Budish regarding status; confer
 with MLT regarding letter to Judge
 Dowd; review file regarding discovery.
7/10/86 Research. MLT 5.20 5.20 Research not identified
7/13/86 Prepare memorandum regarding question JCW 2.00
 of separate representation for
 bondholders.
7/14/86 Research on LEXIS regarding separate JJ 1.10 1.10 Librarian
 representation.
7/14/86 Draft memorandum regarding representation JCW 3.80 3.80 Purpose of research
 of bondholders. not identified
7/14/86 Research. MLT 3.80
7/18/86 Draft interrogatories and request for JCW 2.50
 production of documents; correspond
 to opposing counsel regarding depositions.
7/25/86 Confer with Joe Sesler regarding status. JCW .30
7/28/86 Telephone conference with Kathy Hartner. FAS .20
7/30/86 Review pleadings; confer with JCW. DBG .60 .60 Interoffice communication
 .70 Duplicate charges
7/30/86 Confer with JCW. FAS .70
7/30/86 Confer with Kathy Hartner regarding JCW 3.60
 request for documents and interrogatories;
 confer with Alan Briggs regarding
 letter to bondholders; review Tonn &
 Blank's memorandum regarding representation
 of bondholders.
7/31/86 Confer with attorneys Budish and Greenwald JCW 3.60
 regarding discovery; draft
 response to amended complaint.
 -5- PAGE TOTAL 36.6 17.7
*889
8/1/86 Telephone conference with Kathy Hartner. FAS .10
8/1/86 Draft request for production of JCW 1.60 .30 Interoffice Communication
 documents; confer with FAS and Kathy
 Hartner.
8/4/86 Prepare answers to interrogatories; JCW 1.40
 correspond to Joe Sesler; confer with
 Joe Sesler and Noel Knox regarding
 depositions; draft letter to bondholders.
8/8/86 Telephone conference with Joe Sesler. FAS .40
8/8/86 Draft correspondence to bondholders; JCW .30
 prepare memorandum.
8/11/86 Confer with MLT. JCW .80 .80 Interoffice Communication
8/11/86 Confer with MLT; review file. MLT 1.30 .80
8/12/86 Review documents. MLT 4.20
8/12/86 Confer with JCW regarding strategy. FAS .20 .20 Interoffice Communication
8/12/86 Confer with MLT regarding drafting of JCW 1.60 .30
 motion for summary judgment; confer
 with Kathy Hartner regarding her
 deposition.
8/13/86 Research to prepare motion for summary MLT .20
 judgment.
8/14/86 Research regarding places for taking JCW 2.00
 depositions; prepare notices of
 deposition; confer with attorney
 Budish regarding deposition scheduling.
8/14/86 Research to prepare motion for summary MLT 2.60
 judgment.
8/15/86 Research. MLT 7.20 7.20
 Research not identified
8/15/86 Confer with attorney Budish regarding JCW .70 If SJ, excessive.
 depositions; confer with MLT regarding .30 Interoffice Communication
 summary judgment motion.
8/16/86 Draft memo responsive to Tonn & Blank JCW 1.50
 regarding representation of bondholders;
 correspond to attorney Allison.
8/16/86 Draft summary judgment motion. MLT 3.20
8/17/86 Draft summary judgment motion. MLT 2.60
8/18/86 Draft and review summary judgment MLT 5.70
 motion.
-6- PAGE TOTAL 37.6 9.9
*890
8/19/86 Review draft of summary judgment JCW 1.50
 motion; confer with MLT regarding .30 Interoffice Communication
 same; confer with attorney Budish
 regarding depositions and other
 discovery matters.
8/19/86 Review summary judgment motion; confer MLT 1.40 1.00
 with JCW regarding same; examine
 documents.
8/20/86 Confer with attorney Allison regarding JCW .30
 memo; confer with Joe Sesler regarding
 scheduling of depositions.
8/20/86 Draft summary judgment motion; research MLT 4.20
 regarding same.
8/21/86 Review Eversole's answers to interrogatories; JCW 2.40 .30 Interoffice Communication
 confer with MLT regarding
 summary judgment motion; prepare
 deposition checklist.
8/21/86 Research; draft summary judgment motion. MLT 6.40
8/22/86 Confer with MLT regarding summary JCW 3.40
 judgment motion; review motion for .40
 extension of time filed by Eversole and
 Tonn & Blank's answers to discovery
 requests; correspond to Messrs. Landers, Interoffice Communication
 Allison and Sesler and Ms. Hartner;
 review documents provided by Eversole. .30
8/22/86 Confer with JCW regarding summary MLT 6.40
 judgment motion; draft same.
8/23/86 Prepare for depositions. JCW 3.00
8/24/86 Draft summary judgment motion. MLT 5.90
8/25/86 Prepare for depositions; attend JCW 8.00 8.00 Duplicate Services; No
 deposition of Ken Eversole. explanation of need for
 two attorneys
8/25/86 Revise motion; research; attend MLT 8.20
 deposition of Ken Eversole.
8/26/86 Revise motion and Sesler affidavit; JCW 8.50
 confer with Joe Sesler and Kathy
 Hartner regarding depositions; prepare
 for depositions.
8/26/86 Confer with JCW. MLT 1.60 1.60 Interoffice Communication
8/27/86 Review and cite-check motion for KLW 1.00 .50 Paralegal
 summary judgment.
 -7- PAGE TOTAL 62.2 12.5
*891
8/27/86 Travel to Akron for Stein deposition JCW 8.50 2.0 Travel Time
 and status conference; confer with
 Kathy Hartner and attorney keating
 regarding status; prepare for deposition
 of Mr. Zimmerman of Tonn & Blank.
8/27/86 Revise motion regarding negligence and MLT .90
 breach of fiduciary duty; review
 motion.
8/28/86 Attend depositions of Messrs. Stein and JCW 7.50
 Zimmerman.
8/28/86 Research regarding Fifth Amendment MLT 5.80
 privilege against self-incrimination.
8/29/86 Attend depositions of Joe Sesler, Kathy JCW 7.80
 Hartner and Tim Adryan; confer with
 clients regarding depositions.
8/29/86 Research regarding Fifth Amendment. MLT 6.00
8/30/86 Research regarding Fifth Amendment. MLT 1.20
9/2/86 Review plan. FAS .10
9/2/86 Confer with attorney Gilligan regarding JCW 2.00 .50
 discovery; confer with MLT regarding
 research; confer with attorney Landers Interoffice Communication
 regarding negotiations with Warren
 General; draft answers to cross claims
 of Denman's and Schuler.
9/2/86 Research regarding Fifth Amendment and MLT 6.20 .50
 assignment of promissory note and
 judgment; confer with JCW.
9/3/86 Confer with JCW. FAS .40 .40
9/3/86 Confer with MLT; prepare motion to turn JCW 4.50 .40 Interoffice Communicatior
 over Veres note; confer with attorney
 Gilligan regarding letter of intent;
 confer with attorneys Gilligan and
 Landers regarding hospital negotiations.
9/3/86 Research regarding assignment of MLT .70
 promissory note.
9/4/86 Revise second motion for summary JCW 1.20
 judgment; confer with attorney Gilligan
 regarding furniture, promissory note
 and depositions.
 PAGE TOTAL 52.8 3.80
 -8-
*892
9/5/86 Confer with attorney Landers and JCW 3.20
 Mr. Stein regarding miscellaneous
 matters; confer with attorneys Budish
 and Gilligan regarding Hartner
 deposition; draft order regarding
 veres note; confer with Messrs. Stein,
 Landers, Gilligan and Eversole regarding
 Veres note, Warren General
 Hospital and furniture.
9/8/86 Confer with attorney Landers regarding JCW 1.50
 Veres note and depositions; confer
 with Mike Allison regarding Veres note;
 confer with Kathy Hartner regarding
 preparation for deposition and status
 of negotiations.
9/8/86 Review motion regarding Veres note. MLT .30
9/9/86 Attend depositions of Hartner and JCW 7.00
 Eversole; confer with attorneys
 Greenwald, Landers and Budish.
9/10/86 Draft letter to Judge regarding Warren JCW 1.00
 General negotiations and agreed order
 regarding Veres note..
9/11/86 Review recently filed pleadings. JCW .30
9/12/86 Confer with court officials regarding JCW .30
 status conference; confer with
 attorney Budish regarding motion.
9/13/86 Review Bank One's cross-claim filed JCW .30
 in state court foreclosure.
9/15/86 Research regarding assignment of MLT 2.10
 promissory note; draft documents.
9/16/86 Review pleadings; confer with attorney JCW .30
 Greenwald regarding furniture.
9/16/86 Draft documents regarding assignment MLT 3.60
 of promissory note; revise same;
 review file; research.
9/17/86 Confer with Joe Sesler regarding status; JCW .30
 review list of furniture.
9/17/86 Research regarding assignment of note. MLT 2.60
9/18/86 Research regarding assignment of MLT 3.40 .40 Interoffice Communication
 judgment; confer with JCW.
 PAGE TOTAL 26.2 .40
 -9-
*893
9/18/86 Confer with MLT regarding assignment JCW .60 .30 Interoffice Communication
 of Veres judgment; correspond to
 attorney Landers regarding same.
9/19/86 Research regarding answer to Bank One's MLT 6.20
 cross-claim; review documents.
9/22/86 Draft, review and revise answer to MLT 1.70
 Bank One's cross-claim.
9/24/86 Review Tonn & Blank's memo in opposition JCW 2.00
 to summary judgment motion; correspond
 to Messrs. Sesler and Allison and Ms.
 Hartner regarding same; confer with
 attorneys Keating and Landers regarding
 status of Warren General negotiations and
 Veres note.
9/25/86 Review pleadings; confer with JCW. DBG 1.00 1.00 Interoffice Communication
 Duplicate Services
9/25/86 Review Zimmerman deposition; confer with JCW 1.50
 attorney Greenwald regarding status; .50 Interoffice Communication
 confer with DBG regarding status and
 briefing of summary judgment motion;
 confer with attorney Budish regarding
 status.
9/25/86 Review memo in opposition to motion for MLT 1.50
 summary judgment.
9/26/86 Review memo in opposition to motion for FAS .50
 summary judgment.
9/30/86 Confer with Joe Sesler and MLT JCW 1.00 .40 Interoffice Communication
 regarding reply brief on motion
 for summary judgment; review pleadings.
9/30/86 Draft reply memorandum; confer with MLT 8.00
 JCW; research regarding reply .40 Interoffice Communication
 memorandum and promissory estoppel;
 review motion.
10/1/86 Confer with attorneys Budish and JCW 3.30
 Greenwald regarding status; confer with
 MLT regarding reply memo; review
 deposition of Mr. Zimmerman in order to
 prepare reply memo. 1.0 Interoffice Communication
10/1/86 Research regarding reply to Tonn & MLT 9.90
 Blank's motion.
10/2/86 Confer with Joe Sesler and Joe Cook FAS 1.20
 of BancOhio.
 -10- PAGE TOTAL 38.4 3.6
*894
10/2/86 Prepare reply memo and motion for JCW 5.70
 leave; confer with MLT regarding 1.0 Interoffice Communication
 research needed for same; confer with
 Kathy Hartner, Joe Sesler, Joe Cook
 and FAS; prepare for hearing.
10/2/86 Research regarding promissory estoppel MLT 9.10 .6 Interoffice Communication
 for inclusion in reply memo; confer
 with JCW; prepare reply memo.
10/3/86 Travel to Akron; attend hearing on JCW 8.20 2.0 Travel Time
 motion for possession of project
 facility; confer with Judge and
 opposing counsel; confer with
 Kathy Hartner regarding reserve
 account; confer with Joe Sesler
 regarding Warren General Hospital.
10/5/86 Prepare summaries and checklists in JCW 2.00
 preparation for meeting; review
 Tonn & Blank's claim.
10/6/86 Confer with firm attorney and client. DBG 2.40 2.40 Interoffice Communication
10/6/86 Meeting with Joe Sesler and Mr. FAS 3.00
 Davidson. & Duplicate Services
10/6/86 Prepare summaries for meeting; confer JCW 6.60 4.00
 with DBG and FAS; confer with attorney
 Landers and Joe Sesler regarding
 security; meeting with Elva Smith,
 Mike Allison, DBG, FAS and Joe Sesler;
 confer with attorneys Greenwald, Budish
 and Landers.
10/6/86 Confer with FAS. MLT .40 .40
10/7/86 Confer with JCW. FAS .50 .50 Interoffice Communication
10/7/86 Confer with attorney Greenwald; correspond JCW .50
 to Joe Sesler.
10/7/86 Index deposition; prepare document MLT 4.70
 request.
10/8/86 Review file regarding claim of Second JCW 3.10
 National Bank of Warren; review Clancy
 security contract; correspond to Joe
 Sesler regarding same; review file to
 prepare checklist for trial; correspond
 to attorney Budish regarding discovery'
 confer with attorneys Landers, Staib
 and Greenwald regarding possession of
 facility furniture; confer with Elva
 Smith.
 -11- PAGE TOTAL 46.2 10.9
*895
10/8/86 Index deposition. MLT .40
10/9/86 Confer with JCW. FAS .20 .20 Interoffice Communication
10/9/86 Index deposition. MLT 1.60
10/9/86 Confer with Joe Sesler and Elva Smith JCW 2.50
 regarding revisions to letter; review
 Eversole financial records; draft
 letter to counsel regarding loan; confer
 with attorney Landers' office regarding
 financials.
10/10/86 Confer with Debbie of Clerk's office JCW .80
 regarding scheduling; confer with
 attorney Greenwald regarding Eversole
 financials; confer with attorneys Budish
 and Staib regarding status and proceedings
 to prepare for trial.
10/11/86 Telephone conference with Dick Kane; FAS 1.00
 review indenture. .40 Interoffice Communication
10/13/86 Revise deposition index; research MLT 3.60
 regarding Section 327(c).
10/14/86 Confer with attorneys Landers and JCW 1.00
 Greenwald, Joe Sesler and MLT;
 review Tonn & Blank's motions.
10/14/86 Review; review pleadings and motions. MLT 3.80
10/15/86 Confer with JCW; review purchase FAS .50 .20
 contract.
10/15/86 Review draft agreement with Warren JCW 7.70 Interoffice Communication
 General; confer with PAP and FAS
 regarding health law aspects; confer 1.70
 with attorney Budish regarding proposed
 settlement and documents; confer with
 Joe Sesler and Kathy Hartner regarding
 documents and trial; review Second
 National Bank's mortgage lien; confer with
 attorney Landers regarding Warren General
 contract and Stein's assets; confer with
 Judge regarding settlement; review
 financial statements and information
 regarding collateral; confer with MLT
 regarding trial preparation.
10/15/86 Confer with JCW and BWM; review SHPDA PAP 2.30 1.00
 files; review purchase agreement with
 Warren General; research law; prepare
 checklist; review correspondence from
 SHPDA files; telephone call to Joel
 Mariotti at SHPDA.
 -12- PAGE TOTAL 25.4 3.5
*896
10/15/86 Confer with PAP and MSG. BWM .20 .20
10/15/86 Index deposition; confer with JCW MLT 7.70 .70 Interoffice Communication
 regarding trial preparation; review
 contract; research trial strategies;
 prepare documents; reorganize index.
10/16/86 Confer with JCW; draft memorandum. PAP .50 .50
10/16/86 Review information regarding assets of JCW 5.60
 Stein and Eversole; confer with Joe
 Sesler and FAS regarding Eversole;
 draft motion for continuance; confer Interoffice Communication
 with attorneys Budish and Landers
 and Messrs. Sesler and Stein.
10/16/86 Confer with JCW. JKL .50 .40
10/16/86 Review documents; confer with JCW; MLT 10.10 1.10
 review memorandum; index depositions;
 draft documents; confer with JCW
 regarding trial preparation and
 settlement potential.
10/17/86 Confer with JCW regarding trial FAS .60 .60
 preparation and settlement potential.
10/17/86 Confer with attorneys Davidson, Smith, JCW 7.50 .50
 Knight, Landers, Budish, Staib, FAS
 and MLT and Mr. Sesler; review order Interoffice Communication
 and subpoenas; prepare for trial.
10/17/86 Confer with JCW; review memo. PAP .30 .30
10/17/86 Index depositions of Hartner, Eversole MLT 10.10 1.00
 and Stein; review pleadings and index;
 confer with JCW; review brief.
10/18/86 Prepare checklist regarding resolution JCW 5.00
 of matters via sale to Warren General;
 prepare for trial; confer with Joe
 Sesler and FAS regarding same.
10/18/86 Prepare for trial. MLT 4.30 2.3 Duplicate Services;
 Excessive
10/19/86 Confer firm attorneys regarding FAS 1.50 1.0
 security for advance to Gillette;
 review agreement with Warren General. Interoffice Communication
10/19/86 Confer with Firm attorneys regarding JCW 5.00 1.0
 security structure; confer with
 attorney Knight regarding security
 problems and status; prepare for trial.
10/19/86 Prepare for trial. MLT 5.50 2.5 Duplicate Services;
 Excessive
 -13-
 PAGE TOTAL 64.4 12.2
*897
10/20/86 Telephone call to Preston Gaddis FAS .20
 regarding airplane title.
10/20/86 Prepare for and attend trial proceedings; JCW 8.00
 negotiate settlement; confer
 with opposing counsel and Joe Sesler;
 attend jury selection. Duplicate Services;
 No explanation for
10/20/86 Confer with Joe Sesler; attend MLT 8.00 8.00 need for two attorneys
 settlement negotiations and voir dire.
10/21/86 Meeting with attorney Landers JCW 8.00
 regarding Stein collateral; confer
 with attorney Staib regarding settlement
 agreement; review documents at
 Trumbull County Recorder's office;
 meeting with attorneys Landers and
 Zuzulo regarding title problem;
 confer with attorney Landers regarding
 furniture.
10/21/86 Review and organize file. MLT .30
10/21/86 Telephone call to attorney Gaddis; FAS .70 .40 Interoffice Communication
 telephone call to JCW regarding
 settlement.
10/22/86 Meeting with JCW and JKL; confer with FAS 1.50 1.50 Interoffice Communication
 JCW regarding settlement.
10/22/86 Confer with PAP and attorney Landers JCW 6.40
 regarding Certificate of Need;
 confer with attorney Gilligan regarding
 Eversole furniture; confer with FAS 1.00
 and JKL regarding drafting of settlement
 documents; confer with attorney Budish,
 Judge Dowd, Joe Sesler and attorney
 Knight regarding scheduling.
10/22/86 Meeting with JCW and FAS; draft JKL 3.00 1.00
 promissory note and security
 agreement.
10/22/86 Draft trial brief. MLT 8.30
10/22/86 Review correspondence from attorney PAP .80 .30
 Landers; confer with JCW; telephone
 call to attorney Landers.
10/23/86 Confer with Joe Sesler, Elva Smith and JCW 6.00
 attorney Knight; revise settlement
 agreement; confer with attorneys
 Landers, Budish and Staib; prepare
 trial brief.
 -14-
 PAGE TOTAL 51.2 12.2
*898
10/23/86 Review settlement documents. FAS .50
10/23/86 Confer with JCW. PAP .30 .30 Interoffice Communication
10/23/86 Draft promissory note, mortgage and JKL 5.20
 security agreement.
10/23/86 Draft trial brief. MLT 2.00
10/24/86 Confer with attorney Landers regarding JCW 6.00
 loan commitment and settlement; confer
 with attorney Gilligan regarding
 furniture and collateral; confer with
 Joe Sesler and attorney Knight regarding
 settlement agreement; revise same; confer
 with attorneys Budish and Gilligan and
 Judge's Clerk regarding hearing on
 motions, etc.; correspond to attorneys
 Budish and Gilligan regarding same.
10/24/86 Prepare mortgage; telephone call to JKL 5.50
 Tennessee counsel; correspond to same; .50 Interoffice Communication
 confer with JRG.
10/25/86 Draft agreement. JKL 2.50
10/27/86 Confer with JKL regarding security FAS .50 .50
 agreement.
10/27/86 Confer with attorneys Landers, Budish JCW 2.50
 and Gilligan and Judge Shaker regarding Interoffice Communication
 state court foreclosure.
10/27/86 Prepare agreement; confer with FAS JKL 2.00 1.00
 and JCW.
10/28/86 Prepare agreement; confer with JCW; JKL 2.00 .50 Interoffice Communication
 telephone call to local counsel.
10/28/86 Confer with Joe Sesler regarding status JCW .60
 and Eversole collateral; confer with
 attorney Budish.
10/29/86 Confer with Joe Sesler and Elva Smith JCW 2.00
 regarding final revisions to settlement
 agreement; confer with attorneys Landers
 and Budish regarding same.
10/29/86 Prepare security agreements, notes, JKL 7.50
 etc.
10/30/86 Revise settlement agreement; confer JCW 2.40
 with Joe Sesler and attorneys Budish
 and Gilligan regarding furniture and
 collateral.
 -15-
 PAGE TOTAL 41.5 2.8
*899
10/30/86 Draft agreement; correspond to Schottenstein; JKL 2.50
 prepare documents; telephone
 call to Tennessee counsel; confer with .50 Interoffice Communication
 JCW.
10/31/86 Confer with Joe Sesler and Bill Clancy JCW 4.20
 regarding delivery of furniture; confer
 with attorney Landers; review attorney
 Gilligan's changes to settlement agreement;
 confer with JKL regarding .30
 Tennessee farm; confer with Joe Sesler Interoffice Communication
 regarding Eversole collateral; confer
 with attorney Gilligan regarding same.
10/31/86 Prepare documents; telephone calls to JKL 2.30 .30
 Tennessee counsel; confer with JCW.
11/1/86 Prepare documents. JKL 2.00 2.00 No identification of
 document
11/3/86 Review correspondence from Tennessee JKL 3.20
 counsel; prepare documents, including
 deed of trust; telephone calls to Mr. .50 Interoffice Communication
 Hoffman regarding insurance, Tennessee
 counsel and Schottenstein; confer with
 JCW.
11/4/86 Confer with attorney Gilligan regarding JCW 3.60
 Eversole advance; confer with Joe Sesler,
 Elva Smith and attorney Knight regarding
 settlement agreement; confer with attorney
 Budish regarding collateral; confer with
 attorneys Landers, Budish and Gilligan
 regarding settlement agreement.
11/4/86 Prepare Schottenstein's changes; review JKL 4.00
 same.
11/6/86 Confer with Joe Sesler and attorney JCW 2.90
 Knight regarding revisions to
 Eversole advance documents; revise
 same; confer with attorney Landers
 and Messrs. Sesler and Knox regarding
 insurance; confer with Mr. Hoffman
 regarding Eversole loan documents.
11/7/86 Prepare final Eversole documents; confer JCW .50
 with JKL regarding same; correspond .20
 to attorney Knight and Messrs. Knox,
 Denz and Budish regarding insurance.
11/7/86 Prepare for closing; prepare written JKL 7.70 .20 Interoffice Communication
 resolutions; telephone calls to bank
 counsel; confer with JCW.
 -16-
 PAGE TOTAL 32.9 4.0
*900
11/8/86 Prepare for closing; prepare documents; JKL 3.00 Interoffice Communication
 confer with JCW regarding same. 1.0 No designation of
 documents
11/10/86 Confer with JKL, attorneys Budish JCW 3.60
 and Gilligan and Messrs. Zimmerman
 and Knox regarding insurance; 1.0 Interoffice Communication
 meeting with Eversole regarding loan
 documents; confer with JKL; correspond
 to attorney Oscar regarding Tonn &
 Blank's comments; correspond to
 attorneys Landers, Budish and Gilligan.
11/10/86 Telephone call to Noel Knox. FAS .30
11/10/86 Prepare for and attend closing; telephone JKL 8.50 2.0 Interoffice Communication;
 calls to various parties; confer with No designation of document
 JCW; research regarding UCC law;
 prepare documents.
11/11/86 Confer with JCW regarding litigation FAS .20
 strategy. .20
11/11/86 Send notifications; confer with JCW. JKL 2.00 1.00 Interoffice Communication
11/12/86 Confer with attorney Budish regarding JCW 1.00
 status; prepare telegram to attorney
 Landers regarding plumbing at facility;
 confer with Noel Knox regarding plumbing
 at facility.
11/13/86 Confer with Messrs. Knox and Sesler JCW .50
 regarding utilities; confer with
 attorney Gilligan regarding furniture
 and equipment.
11/13/86 Telephone call from and correspond to JKL .50
 American Quarter Horse Association.
11/14/86 Confer with attorney Budish regarding JCW .30
 status.
11/17/86 Telephone call to Dick Kane and John FAS 1.20
 Cook regarding Warren General
 transaction.
11/17/86 Confer with attorneys Landers, FAS JCW 1.00
 and Budish and Messrs. Sesler and Knox
 regarding settlement status and Warren
 General Hospital.
11/17/86 Confer with JCW. PAP .30 .30 Interoffice Communication
 PAGE TOTAL 22.4 5.5
 -17-
*901
11/18/86 Confer with JCW regarding strategy; FAS .80 .20
 telephone call to attorney Cook
 regarding Warren General purchase
 contract.
11/18/86 Confer with PAP and FAS; confer with JCW 1.40
 with Joe Sesler regarding utilities; .20
 draft Warren General provisions Interoffice Communication
 regarding Medicare certification;
 confer with and correspond to attorney
 Landers regarding same; confer with attorney
 Budish regarding status.
11/18/86 Confer with JCW and FAS. PAP .20 .20
11/19/86 Correspond to Joe Sesler regarding JCW .50
 Stein requisition forms, etc.; confer
 with attorney Gilligan regarding status.
11/20/86 Confer with attorney Landers regarding JCW .50
 Warren General and utilities.
11/20/86 Review letters and organize files; JKL .80
 telephone call to Tim Hoffman.
11/21/86 Correspond to attorneys Landers and JCW .30
 Gilligan regarding disbursements.
11/21/86 Confer with JCW. PAP .20 .20 Interoffice Communication
11/24/86 Confer with JCW regarding Warren FAS .70 .70 Interoffice Communication
 General contract.
11/24/86 Confer with attorney Budish regarding JCW .30 .20
 access to facility; confer with FAS
 regarding status;
11/24/86 Telephone call with Tim Hoffman. JKL .20
11/25/86 Confer with attorney Cook regarding JCW 1.90
 status of Warren General; confer with
 attorney Budish regarding kitchen
 equipment and furniture; correspond
 to attorneys Gilligan and Landers
 regarding furniture and Warren
 General; confer with Kathy Hartner .20
 and FAS regarding Norwood. .20 Interoffice Communication
11/25/86 Confer with JCW regarding certificate PAP .20
 of Need.
12/1/86 Telephone call to Motor Vehicle Bureau JKL 1.20 .50 Interoffice Communication
 and Schottenstein; confer with JCW;
 correspond to counsel.
 -18-
 PAGE TOTAL 9.2 2.6
*902
12/1/86 Confer with attorneys Budish, Boone, JCW 1.30
 Gilligan and JKL and Mr. Sesler
 regarding status of settlement agreement; .20 Interoffice Communication
 review same regarding action to
 be taken.
12/2/86 Confer with attorneys Landers and FAS JCW .40 .20 Interoffice Communication
 regarding status.
12/2/86 Telephone calls to Motor Vehicle Bureau JKL 1.00
 and Schottenstein; send certificate
 for filing.
12/3/86 Review agreement; call to Motor Vehicle JKL .50
 Bureau.
12/4/86 Telephone call to attorney Cook. FAS .10
12/5/86 Confer with JCW. FAS .20 .20 Interoffice Communication
12/5/86 Review letters from Warren General and JCW .50
 Department of Health; confer with Joe
 Sesler regarding same.
12/5/86 Confer with attorneys Staib, Keating JCW 2.00 .20 Interoffice Communication
 and FAS and Mr. Stein regarding
 status of Warren General transaction
 and settlement.
12/6/86 Confer with attorney Lorenzetti and Mr. JCW .40
 Stein regarding Warren General transaction.
12/8/86 Confer with attorney Gilligan regarding JCW .30
 status of furniture and equipment.
12/10/86 Confer with attorney Keating regarding JCW .50
 status of Warren General transaction;
 confer with Mr. Sesler regarding same;
 confer with Mr. Sniegocki of Swink & Co.
12/11/86 Confer with attorneys Lorenzetti and JCW 1.00 .20 Interoffice Communication
 Staib and Mr. Stein regarding status;
 confer with FAS and Joe Sesler regarding
 same.
12/12/86 Confer with JCW; telephone call to FAS 1.10 .20 Interoffice Communication
 Barbara Knight and Joe Sesler regarding
 resumption of construction.
 PAGE TOTAL 9.2 1.2
 -19-
*903
12/12/86 Confer with Mr. Sesler and attorney JCW 2.50
 knight regarding budget expenditures
 and considerations; confer with attorney
 Gilligan regarding furniture; review
 file to prepare checklist; confer with
 attorneys Lorenzetti, Budish and Staib
 regarding resumption of work on facility.
12/17/86 Confer with attorney Keating regarding JCW .30
 status of Warren General matter.
12/18/86 Confer with attorneys Lorenzetti and JCW 1.00
 Staib regarding status; confer with
 Mr. Sesler and attorney Knight regarding
 same.
12/22/86 Confer with attorneys Gilligan and Staib JCW 1.50
 regarding status; review file to prepare
 for trip to Warren.
12/22/86 Review assignment documents. MLT .70
12/23/86 Travel to Warren to examine nursing home JCW 7.70 3.0 Travel Time
 and meet with attorney Lorenzetti and
 Mr. Stein; travel to court clerk to file
 Veres assignment; travel to court clerk
 regarding Am-Care lawsuit; travel to
 Recorder's office regarding Veres real
 estate; confer with attorneys Lorenzetti
 and Gilligan; correspond to Messrs. Sesler
 and Stein and attorney Knight.
12/24/86 Correspond to Messrs. Sesler, Stein and JCW 1.50
 Sniegocki and attorneys Knight and
 Gilligan; confer with attorney Gilligan.
12/24/86 Prepare power of attorney; telephone JKL 1.00
 call to Division of Motor Vehicles.
12/24/86 Confer with JCW. BWM .30 .30 Interoffice Communication
12/29/86 Confer with Joe Sesler regarding JCW .30
 status and alternatives.
12/29/86 Review files; telephone calls to JKL 2.00
 Division of Motor Vehicles; travel
 to Division of Motor Vehicles; confer
 with Division officials and attorney.
12/29/86 Telephone call to Ohio Department of BWM .50
 Health; review correspondence.
12/29/86 Review correspondence. MLT .20
 -20-
 PAGE TOTAL 19.5 3.3
*904
12/29/86 Confer with BWM. MSG .50 .50 Interoffice Communication
12/30/86 Confer with Mr. Sesler and FAS; JCW 1.20
 correspond to Mr. Sniegocki and
 attorney Staib; confer with attorneys
 Gilligan and Staib and Mr. Eversole
 regarding status.
12/30/86 Telephone call to attorney; review files JKL 1.50
 regarding perfection; correspond to
 attorney.
12/31/86 Confer with JCW regarding status. FAS .30 .30
12/31/86 Confer with FAS and BWM regarding JCW .30 .20 Interoffice Communication
 Certificate of Need; confer with
 Kathy Hartner regarding requisitions.
12/31/86 Confer with JCW; telephone call BWM .20 .10
 to Ohio Department of Health.
1987
1/2 Conference with Messrs. Sesler and Staib
 regarding status. JCW .3
1/5 Conference with BWM regarding Department of
 Health status; correspondence with clerk of
 courts regarding Stein assignment;
 conference with Mr. Sniegocki of Swink
 regarding potential purchasers. JCW .9 .30 Interoffice Communication
1/6 Conference with JCW regarding SHPDA. FAS .2 .20
1/6 Conference with PAP regarding cost overrun
 issue; conference with Messrs. Sesler and
 Knox; conference with Mr. Boyce. JCW .8 .20 Interoffice Communication
1/6 Conference with JCW regarding CON matters. PAP .5 .50
1/6 Review of correspondence. MLT .1
1/7 Conference with Mr. Sesler regarding
 addendum; review file to prepare for
 meeting with Mr. Boyce. JCW .7
1/7 Review of law regarding cost overruns. PAP .2
1/8 Preparation for and meeting with Mr. Boyce
 regarding cost of project; conference with
 attorney Gilligan regarding cost of
 project; conference with Mr. Sesler
 regarding need for additional funds. JCW 3.8
 -21-
 PAGE TOTAL 11.5 2.3
*905
1/8/87 Meeting with Mr. Boyce regarding cost
 overrun; conference with JCW. PAP 1.4 .40 Interoffice Communication
1/9 Review Tim Hoffman correspondence. JKL 1.0
1/11 Review documents and organize files. MLT .5
1/12 Conference with Mr. Boyce regarding status;
 correspondence with attorney Gallo
 regarding Veres judgment. JCW .5
1/13 Review file regarding disbursements;
 correspondence with Messrs. Stein,
 Gilligan, and Lorenzetti regarding same;
 conference with Mr. Sniegocki and attorney
 for Swink & Co. regarding status. JCW 1.2
1/14 Conference with Ms. Hartner and Mr. Sesler
 regarding status of accounts and recent
 developments. JCW .5
1/16 Review cost analysis of James Boyce; review
 letter from attorney Gallo regarding Veres
 note. JCW .5
1/16 Review of opinion. JKL .3
1/20 Conference with attorneys Staib, Budish,
 Lorenzetti, and Gilligan regarding
 construction; conference with Mr. Boyce
 regarding CON; conference with Mr.
 Sniegocki of Swink Co.; review state court
 foreclosure file to prepare for trial. JCW 2.0
1/21 Conference with Atty. Knight and Mr. Sesler
 regarding CON and state court foreclosure
 matters. JCW .9
1/21 Conference with JCW. JKL .2 .20 Interoffice Communication
 .10 Paralegal
1/21 Travel to SHPDA and review files. MSG .2
1/22 Conference with attorneys Staib, Schubert,
 and Gilligan regarding state court
 foreclosure suit; conference with Mr. Boyce
 regarding CON; conference with PAP
 regarding CON. JCW 1.0 .40
 Interoffice Communication
1/22 Conference with JPW. PAP .4 .40
 PAGE TOTAL 10.6 1.5
 -22-
*906
1/23/87 Research regarding jurisdiction of state
 court regarding foreclosure suit;
 conference with attorney Staib regarding
 same; conference with Mr. Sesler and Ms.
 Knight regarding trial; preparation for
 trial. JCW 3.6
1/23 Telephone conference with Ms. Knight;
 preparation for closing. JKL 3.0
1/24 Preparation for trial in state court
 foreclosure. JCW 3.4
1/26 Preparation for trial; revisions to trial
 brief; conference with attorney Staib
 regarding trail; conference with Mr. Sesler
 to prepare for trial and regarding Capital
 assets offer. JCW 2.8
1/26 Correspondence; telephone conference;
 preparation of bible. JKL 1.0
1/26 Conference with JCW. MLT .2 .20 Interoffice Communication
1/26 Review and cite check brief. KLW .6 .30 Paralegal
1/27 Preparation for trial; review and obtain
 documents from recorder's office and Common
 Pleas docket; conference with Messrs.
 Budish, Staib, Schubert, Rudloff, and
 Bulenza; travel with Mr. Schubert and Judge
 to facility; conference with Mr. Sesler
 regarding trial; correspondence with
 attorneys Knight and Staib. JCW 8.5
1/27 Travel to SHPDA offices; review of files
 and documents. MSG .4 .20 Paralegal
1/28 Conference with FAS regarding Capital
 Assets offer; conference with attorney
 Gilligan regarding status of matters;
 conference with attorney Lorenzetti
 regarding Veres property; conference with
 Messrs. Gilligan and Eversole regarding
 Capital Assets; conference with Mr. Sesler
 regarding status; conference with attorney
 Staib. JCW 2.2 .90 Interoffice Communication
1/28 Conference with JCW regarding proposal to
 purchase project. FAS .9 .90
1/29 Conference with JCW regarding proposed
 offer; telephone conference with Mr.
 Sesler. FAS .9 .40 Interoffice Communication
 -23-
 PAGE TOTAL 27.5 2.90
*907
1/29/87 Travel to SHPDA offices; review of files
 and documents. MSG .3 .20 Paralegal
1/30 Conference with Messrs. Sesler and Smith
 and Ms. Knight regarding status and offer
 to purchase; conference with DBG;
 conference with attorney Staib regarding
 inquiry from Department of Health and other
 matters. JCW 1.7 .20 Interoffice Communication
1/30 Review documents from SHPDA file. BWM .1
2/2 Review of documents; conference with Ms.
 Knight and Messrs. Sesler and Knox. DBG 3.8
2/2 Conference with DBG to prepare for meeting;
 conference with Mr. Boyce regarding
 certificate of need; conference with Ms.
 Knight and Messrs. Sesler and Knox
 regarding Capital Assets and status. JCW 2.3 .20 Interoffice Communication
2/3 Conference with JCW regarding indenture. FAS .3 .30 Interoffice Communication
2/3 Conference with FAS; correspondence with
 Atty. Gilligan regarding Andrews meeting. JCW .3 .10
2/3 Review of correspondence. MLT .1
2/5 Review of documents; conference with firm
 attorney. DBG .7 .30
2/5 Conference with Mr. Sniegocki regarding
 status and Capital Assets. JCW .2 Interoffice Communication
2/5 Conference with JCW. PAP .3 .30
2/6 Conference with Mr. Sesler regarding
 Capital Assets and CON completion of
 project; conference with Mr. Boyce
 regarding CON; conference with Mr. Gilligan
 regarding Capital Assets offer. JCW 1.0
2/6 Travel to SHPDA and review of files. MSG .4 .20 Paralegal
2/9 Conference with Mr. Sesler regarding
 meeting with Stein & Eversole. JCW .2
2/12 Conference with Mr. Sesler regarding
 expenses; conference with Messrs. Gilligan,
 Boyce, and Sniegocki regarding status. JCW .6
2/13 Conference with Messrs. Sesler and Boyce
 regarding status. JCW .3
 -24-
 PAGE TOTAL 12.6 1.8
*908
2/17/87 Review of SHPDA files. MSG .2 .10 Paralegal
2/18 Preparation of checklist; conference with
 MLT regarding visit to facility. JCW .5 .10
2/18 Conference with JCW. MLT .1 .10 Interoffice Communication
2/19 Travel to inspect nursing home. MLT 2.1
2/20 Conference with Messrs. Gilligan and
 Sniegocki regarding status; conference with
 BWM. JCW .3 .10 Interoffice Communication
2/20 Conference with JCW. MLT .1 .10
2/23 Conference with Mr. Boyce regarding
 Department of Health matters; conference
 with BWM. JCW .3 .10
 Interoffice Communication
2/23 Review of file; conference with JCW;
 telephone conference with SHPDA. BWM .5 .10
2/24 Preparation for and meeting with Ms. Knight
 and Messrs. Sesler, Knox, and Eversole;
 conference with PAP regarding CON matters. JCW 2.1 .30
2/24 Conference with JCW. PAP .3 .30 Interoffice Communication
2/24 Preparation of memorandum regarding status
 of nursing home site. MLT .3
2/24 Review of SHPDA files. MSG .4 .20 Paralegal
2/25 Conference with BWM regarding CON matters. JCW .3 .30
2/25 Conference with JCW; review CON matters. BWM .5 .30 Interoffice Communication
2/27 Conference with attorney Budish regarding
 status and course of action. JCW .4
3/2 Travel to SHPDA and review of files. MSG .6 .30 Paralegal
3/4 Conference with BWM; review Department of
 Health matters. JCW .4 .10
3/4 Conference with JCW and MSG. BWM .1 .10 Interoffice Communication
3/5 Confer with Messrs. Sesler and Blank
 regarding status and change orders; review
 file and change orders. JCW .8
3/5 Conference with MSG. BWM .1 .10 Interoffice Communication
3/5 Review SHPDA files; conference with BWM. MSG .4 .20 Paralegal
 -25-
 PAGE TOTAL 10.8 2.9
*909
3/6/87 Conference with Mr. Blank regarding
 completion problems; review Tonn & Blank's
 motion for judgment; conference with
 Messrs. Knox and Sesler regarding agenda. JCW 1.0
3/6 Telephone conference with Ohio Department
 of Health; conference with JCW. BWM .2 .10 Interoffice Communication
3/9 Review letter, etc. from Mr. Blank;
 correspondence with Mr. Sesler; conference
 with Mr. Sesler regarding meeting with Mr.
 Eversole; conference with attorney
 Gilligan; review file regarding Tonn &
 Blank's motion for judgment; conference
 with BWM regarding Department of Health
 matters; correspondence with Judge Dowd;
 conference with attorney Budish regarding
 status and scheduling of hearing on motion. JCW 1.7 .60
3/9 Conference with JCW; correspondence with
 Mr. Hoffman. JKL 1.0 .50 Interoffice Communication
3/9 Telephone conference with Ohio Department
 of Health; conference with JCW. BWM .2 .10
3/10 Conference with Mr. Eversole regarding
 Department of Health and project completion
 status; conference with Mr. Sesler. JCW .4
3/11 Telephone conference with Mr. Sesler. FAS .3
3/11 Conference with Mr. Sesler regarding
 Department of Health setting of hearing;
 conferences with FAS, PAP, and BWM;
 conference with attorney Gilligan. JCW 1.2 .50
3/11 Conference with JCW and BWM; telephone
 conference with Mr. Mariotti. PAP 1.0 .50 Interoffice Communication
3/11 Conference with JCW and PAP. BWM .5 .50
3/11 Review of SHPDA files. MSG .3 .20 Paralegal
3/16 Telephone conference with Mr. Knox. FAS .2
3/16 Conference with Judge Dowd's law clerk;
 conference with Messrs. Sesler and Gilligan
 regarding hearing and status. JCW 1.0
3/16 Analysis of CON issue. PAP .3
3/16 Telephone conference with Ohio Department
 of Health; conference with JCW. BWM .2
3/17 Telephone conference with Mr. Sesler. FAS .2 .10 Interoffice Communication
 -26-
 PAGE TOTAL 9.7 3.1
*910
3/17/87 Conference with Messrs. Sesler, Boyce, and
 Budish. JCW 1.6
3/18 Preparation of draft entry; preparation for
 hearing. JCW 1.5
3/18 Review SHPDA file. MSG .4
 .20 Paralegal
3/19 Preparation of documents for hearing;
 conference with Judge Dowd's law clerk;
 conference with TRM; review and finalize
 documents. JCW 3.2 .50
 Interoffice Communication
3/19 Conference with JCW; preparation for
 hearing. TRM 4.0 .50
3/20 Travel to and representation at hearing;
 telephone conference with client. TRM 8.7 2.00 Travel Time
3/20 Review of SHPDA files. MSG .2 .10 Paralegal
3/20 Review of application at SHPDA office;
 preparation of flow chart. BSC .4 .20 Paralegal
3/21 Preparation of flow chart. BSC .2 .10 Paralegal
3/23 Review of application at SHPDA office. BSC .3 .20 Paralegal
3/25 Review of correspondence. TRM .1
3/30 Conference with JCW. FAS .6
 .60 Interoffice Communication
3/30 Review order regarding 3/20 hearing;
 conference with TRM; review documents filed
 by Tonn & Blank; conference with Mr.
 Sesler. JCW 1.0 .20 Interoffice Communication
3/30 Telephone conference with client. TRM .1
3/30 Review of pleadings. MLT .2
3/31 Conference with Mr. Sniegocki; conference
 with Mr. Sesler and FAS regarding payment
 or letter to bondholders. JCW .3
3/31 Conference with JCW. BSC .2
 .20 Interoffice Communication
4/1 Conference with JCW regarding letter to
 bondholders. FAS .5 .50 Interoffice Communication
 PAGE TOTAL 23.5 5.3
 -27-
*911
4/1/87 Preparation of memorandum regarding entry
 of judgment and supporting affidavits;
 conference with Mr. Boyce regarding health
 department matters; conferences with Ms.
 Knight and Messrs. Sesler and Smith;
 conferences with MYS attorneys; revisions
 to letter to Judge Dowd; preparation of
 letter to bondholders and notice of default
 regarding Eversole note; review of Eversole
 note. JCW 6.5
4/1 Conference with JCW. TRM .2
4/1 Review file at SHPDA; conference with JCW. BSC .3
 .20 Interoffice Communication
4/2 Review correspondence to bondholders. FAS .6 .30 Paralegal; Interoffice
4/2 Preparation and finalization of posthearing
 memorandum; conference with Mr.
 Sesler. JCW .3
4/3 Telephone conference with Mr. Sesler. FAS .3
4/3 Review Stein's affidavit; conferences with
 attorneys Velie and Staib; conference with
 Mr. Sesler. JCW .5
4/3 Review of file at SHPDA. BSC .3
4/6 Meeting with Messrs. Sesler and Knox;
 conference with JCW. FAS .4 .40 Duplicate Services
4/6 Meeting with Messrs. Sesler and Knox. JCW .3
4/6 Conference with JCW. BWM .1 .10 Interoffice Communication
4/7 Conference with attorneys Budish and Staib
 regarding possibility of joint pursuit of
 judgment. JCW .2
4/9 Telephone conference with client;
 conference with JCW; review correspondence
 to client; review of file. JKL 1.0 .10 Interoffice Communication
4/9 Review of file at SHPDA. BSC .2
4/10 Conference with Mr. Sniegocki; review of
 recently-filed documents. JCW .3
4/13 Review ruling by Judge Dowd; conference
 with Mr. Sesler. JCW .3
 PAGE TOTAL 11.8 1.1
 -28-
*912
4/14/87 Conference with BSC regarding Department of
 Health matters; conference with Messrs.
 Sesler and Knox; conference with attorney
 Velie regarding entry of judgment and
 status. JCW .8 .50 Paralegal
4/14 Conference with JCW; review files at SHPDA. BSC 1.0 .20 Interoffice Communication
4/15 Conference with attorney Knight regarding
 status and action needed; conference with
 Judge Dowd's law clerk; revisions to
 judgment entry; correspondence with Judge
 Dowd and attorney Landers regarding motion
 for summary judgment. JCW 1.5
4/15 Conference with BSC. BWM .1 .10 Interoffice Communication
4/16 Review file at SHPDA. BSC .1 .10 Paralegal
4/17 Conference with JCW. FAS .2 .20
4/17 Preparation of correspondence with Judge
 Dowd and attorney Landers; conference with Interoffice Communication
 BSC regarding certificate of need papers. JCW .3 .20
4/20 Conference with clerk regarding
 certificate; preparation of certificate,
 praecipe, and checklist for issuance;
 conference with judge's law clerk regarding
 entry of judgment; conferences with Messrs.
 Sesler and Knox and Atty. Knight regarding
 certificate; review procedures regarding
 certificate of judgment; conferences with
 attorneys Budish, Staib, and Velie
 regarding status. JCW 4.5
4/20 Conference with firm attorney regarding
 status. TRM .2 .20 Interoffice Communication
4/20 Review file at SHPDA. BSC .1 .10 Paralegal
4/21 Conference with KLW regarding certificate
 of judgment, etc.; conference with Atty.
 Knight. and Mr. Sesler regarding foreclosure
 motion and certificate of need. JCW 1.0 .30 Interoffice Communication
4/21 Conference with JCW; travel to Akron and
 obtain certificate of judgment; travel to
 warren to file certificate of judgment. KLW 8.4 3.00 Travel Time
4/21 Index application. BSC .7
 .40 Paralegal
4/22 Correspondence with attorney Velie
 regarding certificate of need and sale. JCW .3
 -29-
 PAGE TOTAL 19.2 5.3
*913
4/22/87 Conference with BSC. BWM .1
 .10 Interoffice Communication
4/22 Review file at SHPDA; conference with BWM. BSC .4 .30 Paralegal
4/23 Conference with attorney Velie regarding
 CON. JCW .2
4/24 Conference with BSC. BWM .1
 .10 Interoffice Communication
4/24 Review file at SHPDA; conference with BWM. BSC .3 .20 Paralegal
4/28 Conference with Mr. Sesler and Ms. Knight
 regarding seizing Eversole assets; review
 settlement agreement; conference with
 attorney Budish regarding proceedings to
 enforce judgment. JCW 1.1
4/29 Conferences with Mr. Sesler and attorney
 Velie regarding enforcement of judgment,
 DOH, and financing efforts. JCW .6
4/30 Conference with Atty. Knight and Messrs.
 Smith and Sesler regarding status and
 Eversole financing failure; conference with
 attorney Velie. JCW 1.2
5/1 Conference with PAP regarding Department of
 Health matters; review of file regarding
 Stein assets; conference with attorney
 Knight, Mr. Sesler, and attorney Budish
 regarding execution on judgment; conference
 with Messrs. Velie and Eversole regarding
 Department of Health; telephone conference
 with Ms. Overtuf of Department of Health. JCW 3.0 .20
5/1 Conference with JCW and BWM; legal Interoffice Communication
 research. PAP 1.0 .40
5/1 Conference with PAP; telephone conference
 with Mr. Roederer. BWM .3 .20
5/4 Conference with attorney Knight and Mr.
 Sesler; review of file and procedure
 regarding charging order; revisions to
 application and charging order; preparation
 of garnishment. JCW 5.5
5/4 Conference with BSC. BWM .1 .10 Interoffice Communication
 .10 Paralegal
5/4 Conference with BWM; review file at SHPDA. BSC .8 .40
5/5 Travel to Warren and file garnishments and
 charging order; review dockets and Magdych
 file; investigate and visit project 2.5 Travel Time
 facility. JCW 7.0
 -30-
 PAGE TOTAL 21.7 4.6
*914
5/6/87 Conference with Mr. Sesler regarding
 status. FAS .2
5/6 Conference with Mr. Sesler regarding Tonn &
 Blank letter; conference with PAP regarding
 Department of Health procedure. JCW 1.2 .30
 Interoffice Communication
5/6 Conference with JCW. PAP .3 .30
5/7 Conference with Mr. Sesler regarding
 contract with Stein/Malone; conference with
 PAP and BSC. JCW .3 .20
5/7 Conference with FAS and JCW. PAP .1 .10 Interoffice Communication
5/7 Conference with JCW. BSC .1 .10
5/8 Conference with Messrs. Sesler, Budish,
 Staib, and Velie regarding status and
 financing efforts. JCW 1.0
5/8 Analysis of law regarding cost overrun. PAP .2 .10 Interoffice Communication
5/8 Review of file at SHPDA; conference with Paralegal
 JCW. BSC .8 .40
5/11 Conference with PAP regarding Department of
 Health; preparation of documents to appoint
 KLW as process server; conference with KLW
 regarding service of charging order;
 conference with attorney Knight, Mr.
 Sesler, and attorney Landers regarding
 action to be taken regarding Tonn & Blank
 judgment. JCW 2.2 .50
5/11 Conference with JCW; telephone conference Interoffice Communication
 with Mr. Mariotti; review of Vern Riffe
 correspondence. PAP .9 .10
5/11 Conference with BSC. BWM .1 .10
5/11 Conference with JCW regarding trip to
 Warren. KLW .3 .30 Interoffice Communication
5/11 Review of file at SHPDA; conference with .20
 JCW and BWM. BSC 1.1 .60 Paralegal
5/12 Review of file and analysis of law. PAP .4
5/12 Travel to Warren and Cortland, Ohio, to
 serve charging order. KLW 7.7 2.50 Travel Time
5/13 Conference with Mr. Landers regarding
 request to release charging order. JCW .5 3.50 Paralegal
 -31-
 PAGE TOTAL 17.4 9.3
*915
5/13/87 Conference with JCW; research regarding
 security interests and assignments. MLT 1.5 .20
5/13 Conference with JCW regarding return of
 service; correspondence with the court. KLW .3 .10 Interoffice Communication
5/14 Conference with Mr. Landers; preparation of
 checklist of considerations; conference
 with attorney Knight and Mr. Sesler. JCW 2.7
5/14 Research regarding assignment and charging
 order; conference with JCW; preparation of
 correspondence. MLT 6.0 .20 Interoffice Communication
5/14 Conference with MLT; telephone conference
 with Secretary of State regarding UCC
 filings. KLW .3 .20 Interoffice Communication
5/14 Review of file at SHPDA; conference with
 JCW. BSC .3 .30 Paralegal
5/15 Conference with Mr. Landers regarding
 conditional release of charging order;
 preparation of correspondence. JCW 1.2
5/15 Telephone conference with ODH; conference
 with JCW. BWM .6
 .10 Interoffice Communication
5/15 Conference with MLT; telephone conferences .10 Interoffice Communication
 with Trumbull County Recorder's Office and .20 Paralegal
 title service to order UCC searches. KLW .4
5/16 Correspondence with Mr. Landers regarding
 conditions for release of charging order. JCW 1.3
5/18 Conference with attorney Knight and Messrs.
 Sesler and Landers regarding request to
 release charging order and surety. JCW .8
5/18 Review of correspondence; telephone
 conference with attorney Gessner
 representing Cortland Savings & Banking. MLT .3
5/18 Review of file at SHPDA. BSC .4 .20 Paralegal
5/19 Review documents from attorney Gessner
 regarding assignment of Cortland Savings &
 Banking; conference with MLT; conference
 with Mr. Budish regarding status of efforts
 to resolve. JCW 1.2 .20 Interoffice Communication
5/20 Review of CON bill. PAP .2
 -32-
 PAGE TOTAL 17.5 1.8
*916
5/20/87 Conference with JCW; research Stein
 assignment to Cortland Bank. MLT 5.1 .20 Interoffice Communication
5/20 Telephone conference with title company
 regarding results of search; conference
 with MLT. KLW .2 .20 Interoffice & Paralegal
5/21 Conference with MLT regarding charging
 order priority; conference with attorney
 Knight and Mr. Landers. JCW .4 .20 Interoffice Communication
5/21 Research assignment issues. MLT 5.3
5/21 Review of files at SHPDA. BSC .4 .20 Paralegal
5/22 Conference with Messrs. Sesler and Budish;
 correspondence with Mr. Budish regarding
 threat of sheriff executing on furniture
 and equipment. JCW .9
5/22 Research assignment issues. MLT 2.0
5/26 Conference with Mr. Sesler regarding
 hearing; preparation of checklist for
 hearing on charging order. JCW .6
5/26 Research assignment issues; conference with
 JCW. MLT 1.1 .10 Interoffice Communication
5/26 Review of file at SHPDA. BSC .4 .20 Paralegal
5/27 Conference with Messrs. Sesler and Landers
 regarding licensing, charging order, and
 assignment; preparation for hearing
 regarding charging order and assignment;
 conference with MLT. JCW 3.0 .20
5/27 Research regarding assignment of affidavit; Interoffice Communication
 conference with JCW; preparation of and
 revisions to memorandum of law. MLT 7.8 .20
5/28 Travel to Warren for meeting with Mr. Stein
 and attorney; representation at hearing on
 charging order; preparation and service of
 subpoena on Chicago Title; conference with
 Chicago Title representatives; preparation
 of order directing payment of money. JCW 8.5 2.50 Travel Time
5/28 Revisions to memorandum of law. MLT .2
5/29 Travel to Warren and representation at
 hearing; travel to Cleveland to serve
 charging order; conference with Mr. Newell
 at Chicago Title; conference with Mr.
 Sesler regarding status. JCW 8.0 3.50 Travel Time
 -33-
 PAGE TOTAL 43.9 7.0
*917
5/29/87 Research of Oregon case relating to
 priority of charging order. PNL .5 .20 Paralegal
5/29 Review of file at SHPDA. BSC .4 .40 Interoffice Communication
6/1 Conference with JCW and PAP. FAS .4
6/1 Review motion of T&B to vacate charging
 order; conferences with MLT regarding
 necessary research and charging order;
 conference with Messrs. Sesler and Andrews
 regarding licensing; conference with BSC
 regarding CON over-run application;
 research and memorandum regarding charging
 order. JCW 3.2 .40
6/1 Conference with FAS and JCW. PAP .2 .20 Interoffice Communication
6/1 Conference with JCW; review of file; legal
 research regarding motion to vacate. MLT 8.2 .20
6/2 Preparation of charging order and brief;
 conferences with Messrs. Budish and Staib
 regarding briefing schedule and licensing;
 conference with MLT regarding brief. JCW 4.8 .30
 Interoffice Communication
6/2 Conference with JCW; preparation of
 memorandum contra motion to vacate charging
 order. MLT 10.2 .30
6/2 Review file at SHPDA. BSC .8 .40 Paralegal
6/3 Conference with attorney knight regarding
 status; conference with Judge Shaker
 regarding order; preparation of order. JCW .7
6/3 Conference with BSC. BWM .2
6/3 Conference with BWM. BSC .4 .40 Interoffice Communication
6/4 Conference with Mr. Sesler regarding
 licensing; conference with PAP regarding
 CON and related matters; conferences with
 attorneys Budish and Staib regarding
 status; review Tonn & Blank motion to
 determine priority and brief; conference
 with MLT. JCW 2.5 .80
6/4 Conference with JCW. PAP .6 .60
 Interoffice Communication
6/4 Research regarding similar cases; review of
 pleadings; conference with JCW. MLT 3.2 .20
6/5 Conference with JCW regarding strategy. FAS .5 .50 Interoffice Communication
 -34-
 PAGE TOTAL 36.8 4.9
*918
6/5/87 Review Tonn & Blank's creditors bill;
 conference with MLT regarding briefing of
 charging order issue; conference with Mr.
 Sesler regarding CON and federal
 certification; conferences with Messrs.
 Budish and Gessman; correspondence with Mr.
 Budish. JCW 2.5 .20
 Interoffice Communication
6/5 Research regarding cases cited in brief of
 Tonn & Blank; conference with JCW;
 preparation of reply to Tonn & Blank brief;
 preparation of memorandum of law. MLT 8.1 .20
6/5 Conference with JCW; telephone conference
 with ODH. BWM .5 .20
6/5 Review file at SHPDA. BSC .4 .20 Paralegal
6/7 Preparation of final memorandum regarding
 charging order. JCW .5
6/7 Revisions to memorandum of law. MLT 4.5
6/8 Meeting with trustee officials regarding
 charging order. FAS .8
6/8 Conference with Messrs. Sesler, Knox, and
 Smith regarding status and alternatives;
 review of Judge Shaker's ruling;
 preparation of checklist for meeting;
 conference with attorney Budish regarding
 ruling; conference with Mr. Sesler
 regarding ruling and conversation with Mr.
 Stein. JCW 1.8
6/8 Review of entry and order. MLT .3
6/8 Telephone conference with Ms. Long;
 conference with JCW. BWM .3 .10 Interoffice Communication
6/9 Research regarding supersedeas bonds;
 conference with JCW. MLT 1.0 .20 Interoffice Communication
6/9 Review of file at SHPDA. BSC .4 .20 Paralegal
6/10 Review of indenture; conference with JCW. FAS .9 .20
6/10 Conference with MLT regarding necessity of
 bond for stay; conference with FAS Interoffice Communication
 regarding handling of funds under
 indenture; review mortgage, T&B notice of
 appeal, and motion for stay; research
 regarding lending money from judgment;
 conference with BWM regarding licensing and
 receiver; conference with Mr. Sesler. JCW 2.8 .60
 -35-
 PAGE TOTAL 24.8 2.1
*919
6/10/87 Research regarding stay issue and
 supersedeas bonds; conference with JCW. MLT 6.8 .30 Interoffice Communication
6/11 Conference with MLT regarding appellate
 procedure and alternative course of action;
 revisions to motion; conference with PAP
 regarding value of home and possibility of
 receiver; conferences with Messrs. Staib
 and Budish regarding stay. JCW 1.8 .80
6/11 Conference with JCW. PAP .6 .60 Interoffice Communication
6/11 Research regarding stay issue and appeal
 issues; conference with JCW; preparation of
 motion and praecipe; telephone conference
 with court official. MLT 3.8 .20
6/12 Conference with JCW regarding status. FAS .3 .30
6/12 Conference with attorney Staib regarding
 entry of stay; conference with Mr. Sesler Interoffice Communication
 regarding investment of monies; conference
 with FAS regarding status; review draft
 entry of stay. JCW 2.0 .30
6/13 Review motion of Tonn & Blank to stay filed
 in Court of Appeals. JCW .5
6/15 Review issues of priority between charging
 order and creditors; conference with TEC
 regarding research assignment. JCW 1.9 .30
6/15 Conference with JCW and BWM. PAP .2 .20
6/15 Conference with PAP. BWM .1 .10 Interoffice Communication
6/15 Review assignment to TEC; conference with
 firm attorney regarding appeal and stay. MLT .6 .60
6/15 Review file at SHPDA. BSC .4 .20 Paralegal
6/16 Review Cortland's notice of appeal;
 conferences with Ms. Knight and Messrs.
 Sesler, Smith, and Landers regarding
 status; revise order for stay; conference
 with attorney Staib. JCW 1.3
6/16 Legal research. TEC 2.5 2.50 No description of research
6/17 Conferences with Messrs. Sesler, Landis,
 and Budish regarding status. JCW .5
6/17 Review Cortland appeal. MLT .1
 -36- PAGE TOTAL 23.4 6.4
*920
6/18/87 Conference with TEC regarding Tonn &
 Blank's creditors bill. JCW .5 .5 Interoffice Communication
6/18 Conference with attorney. TEC 1.0 1.00 No description of work
6/19 Conferences with attorneys Budish and Lucci
 regarding Chapter 11 proceedings; revisions
 to Magdych proof of claim. JCW .5
6/19 Preparation of and revisions to pleadings. MLT 2.1
6/19 Research and preparation of memorandum. TEC 1.0 1.0 No description of work
6/19 Conference with SHPDA consultant; review
 files at SHPDA office. BSC .7 .40 Paralegal
6/22 Review letter from attorney Lucci;
 conference with Mr. Sesler regarding
 bankruptcy filings. JCW .3
6/22 Conference with BSC. BWM .1
6/22 Conference with JCW; telephone conference
 with Bankruptcy Court in Youngstown
 regarding schedules; preparation of request
 to address notices in Stein and Gillette
 bankruptcies. KLW .3
6/22 Review of files at SHPDA. BSC .2
6/23 Conference with Mr. Sesler regarding status
 and expression of interest from Eversole;
 conference with attorney Velie. JCW .6 POST PETITION
6/23 Legal research. TEC 1.0
6/24 Conference with JCW. MLT .1
6/25 Conference with JCW. MLT .4
6/25 Review file at SHPDA. BSC .4
6/26 Preparation of and revisions to memorandum. MLT 2.4
6/29 Preparation of course of action to respond
 to Chapter 11 filings; conferences with
 attorneys Budish and Staib. JCW 2.5
6/29 Review of files at SHPDA. BSC .8
6/30 Conference with Mr. Sesler regarding
 security situation; conference with PAP
 regarding new CON law and bankruptcies;
 research regarding alternatives. JCW 3.4
 -37- PAGE TOTAL 5.8 2.9
 GRAND TOTALS 979.1 193.3 = 785.8

NOTES
[1] The two payments totalled $353,562.00. The payments reduced the Debt Service Reserve Fund to approximately Thirty-Three Thousand & 00/100 Dollars ($33,000.00).
[2] Both cases were removed to this Court.
[3] Case Number JLD No. 56, Page 300, Trumbull County Court of Common Pleas.
[4] The appeals were removed to the Bankruptcy Court with consent of all parties on August 6, 1987.
[5] WARREN GENERAL is an Ohio general partnership formed by Warren General Health Care Enterprises, Inc., and Mr. Robert VanSickle. Warren General Health Care Enterprises, Inc., is an affiliate of Warren General Hospital. Mr. VanSickle is a principal of AMCARE HEALTH, INC., a creditor in these Chapter 11 proceedings. BANCOHIO's Disclosure Statement represented that another company in which Mr. VanSickle has an interest, Vanesco, Inc., will, in all probability, manage the GILLETTE facility for WARREN GENERAL.
[6] 11/23/88 Disclosure Statement accompanying the Second Amended Combined Plan of Reorganization submitted by BANCOHIO.
[7] This sum is determined by subtracting the assumed bond debt from the total purchase price.

($3,000,000.00 - $2,610,000.00 = $390,000.00).
[8] Projected from August 31, 1988 through November 30, 1988 at $50,090.00 per month.
[9] Projected from March 31, 1988 to November 30, 1988; balance on March 31, 1988 was $782,000.00; additional interest projected at 6.1 percent (6.1%) per annum.
[10] Any additional sums needed may be obtained, BANCOHIO explains, by liquidating STEIN's real estate interests. The Plan makes no acknowledgement of the approximately $33,000.00 or accrued interest which BANCOHIO is holding in the Debt Service Reserve Fund.
[11] See Proof of Claim of BANCOHIO filed 09/28/87, p. 1.
[12] See 11/23/88 Disclosure Statement, p. 28 (amount to a projected closing date of 11/30/88).
[13] See Proof of Claim of BANCOHIO filed 09/28/87, p. 2.
[14] Id.
[15] Id.
[16] See Disclosure Statement of 11/23/89, p. 29; BANCOHIO has submitted to the Court a statement for professional fee charges through December 30, 1988, in the amount of $226,911.83. It is unclear what portion, if any, of these fees are included in the above-projected disbursements.
[17] Second Modification to Debtors' First Amended Plan, filed 03/31/89.
[18] Cash is accumulating at the rate of some $50,000 per month over operating expenses.
[19] Stein is proposing to loan this sum to Gillette to be repaid on a monthly basis as funds are available. In the event Gillette defaults on a payment of its secured obligation to the bond holders or Cortland Savings & Banking Co., the monthly payment to Stein is to be suspended until the default is cured.
[20] Cortland has agreed to loan Debtors $525,000.00 at 11¾ percent interest per annum, secured by a second mortgage on the nursing home facility. The loan is repayable on a monthly basis upon a 20-year amortization schedule with a seven-year balloon payment.
[21] 1129(a)(4), (5) and (6) provide:

(4) Any payment made or to be made by the proponent by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable;
(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation of such insider.
(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.
[22] In re Centre Court Apartments, Ltd., 85 B.R. 651 (Bankr.N.D.Ga.1988); In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th Cir. 1988); In re Manville Forest Products Corp., 43 B.R. 293 (Bankr.S.D.N.Y.1984); In re Forest Hills Assoc., 40 B.R. 410 (Bankr.S.D.N.Y.1984); In re Masnorth Corp., 36 B.R. 335 (Bankr.N.D. Ga.1984); In re Rainbow Forest Apartments, 33 B.R. 576 (Bankr.N.D.Ga.1983); Valente v. Savings Bank of Rockville, 34 B.R. 362, 363; (D.Conn.1983).
[23] 11 U.S.C. Secs. 1129(a)(9) and (10) provide:

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that 
(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), or 507(a)(b) of this title, each holder of a claim of such class will receive 
(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and
(C) with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.
(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
[24] See also Sec. 6.04 at p. 24 and Sec. 7.02 at p. 28-29 of the Trust Indenture, providing:

Sec. 6.04. Payments to Trustee.
Pursuant to the provisions of the Loan Agreement, the Company has agreed to pay to the Trustee, continuing until the outstanding bond shall have been fully paid and discharged in accordance with the provisions of the Indenture, the reasonable fees, charges, and expenses of the Trustee, as trustee (for Ordinary and Extraordinary Services and Expenses), Bond Registrar and Paying Agent, as and when the same became due; provided, that the Company may, without creating a default thereunder, contest in good faith the necessity for any such Extraordinary Services and Extraordinary Expenses and the reasonableness of any such fees, charges, or expenses.
Sec. 7.02 Fees, Charges, and Expenses of Trustee.
Subject to the provisions of Sec. 6.04 hereof, the Trustee shall be entitled to payment and/or reimbursement for reasonable fees for its Ordinary Services rendered hereunder and all advances, counsel fees, and other Ordinary Expenses reasonably and necessarily made or incurred by the Trustee in connection with such Ordinary Services and, in the event that it should become necessary that the Trustee perform Extraordinary Services, it shall be entitled to reasonable extra compensation therefor, and to reimbursement for reasonable and necessary extraordinary expenses in connection therewith; . . .
[25] Sec. 22 at page 10 of the Mortgage provides:

22. Security for Loan.
This Mortgage is intended to secure, as a first mortgage, the principal amount outstanding on the project bonds and premium, if any, and interest thereon and Additional Payments and other payments to be made under the Loan Agreement, the Note, the Indenture, or this Mortgage relating thereto.
See also Sec. 8.06 of the Trust Indenture, providing that BANCOHIO is to receive its fees and expenses ahead of other distributions. BANCOHIO also asserts the following as security for its fees and expenses: (1) POST LAND COMPANY funds; (2) judgment lien against real estate holdings of STEIN; (3) assignment of judgment lien against Dr. Frank G. Veres.
[26] Sec. 9.4 of the Loan Agreement, at p. 44, provides:

Sec. 9.4. Agreement to Pay Attorneys' Fees and Expenses.
In the event the Company should default under any of the provisions of this Loan Agreement and the Issuer [Trumbull County] or the Trustee should employ attorneys or incur other expenses for the collection of Loan Payments or the enforcement of performance or observance of any obligation or agreement on the part of the Company contained in this Loan Agreement, the Company shall, on demand therefor, reimburse the reasonable fee of such attorneys, to the extent permitted by law, and such other expenses so incurred.
[27] See 01/23/89 Response of BANCOHIO, p. 9, ftnote 1.
[28] See January 23, 1989 Response Brief, p. 2.
[29] See January 23, 1989 Response, p. 4, and Exhibit 2 to that Response.
[30] See p. 882, infra, discussing valuation of GILLETTE facility.
[31] Sec. 7.02, p. 29, Trust Indenture.
[32] See January 23, 1989 Response Brief, p. 9, citing Unsecured Creditors Committee v. Walter E. Heller, 768 F.2d 580, 585 (4th Cir.1985); Joseph F. Sanson Investment Co. v. 268 Ltd., 789 F.2d 674, 675 (9th Cir.1986); Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc., 794 F.2d 1051 (5th Cir.1986).
[33] Exhibit 2 to BANCOHIO's Brief of March 16, 1989.
[34] See ftnote 31.
[35] See March 14, 1989 Brief of Debtors at p. 6. where the Debtors state,

Debtor has proposed and is prepared to pay the claim of the individual bond holders, with reservation of such rights against BANCOHIO as it may be entitled to assert by virtue of, and in the event that a correlation between the construction shortfall and the method by which BANCOHIO disbursed bond proceeds is found to exist.
[36] The breakdown of attorney's charges was submitted as Exhibit 4 of BANCOHIO's January 23, 1989 Response Brief. A copy is annexed here as "Appendix 1".
[37] In making these determinations, we have generally applied the standards of 11 U.S.C. Sec. 330 and the common law which has evolved therefrom.
[38] See January 23, 1989 Response Brief, p. 9.